## UNITED STATES v. UNITED SHOE MACHINERY CORP.

Civ. A. 7198.

United States District Court
D. Massachusetts.

Feb. 18, 1953.

See also, 93 F.Supp. 190.

James M. Malloy, Boston, Mass., Sigmund Timberg, Washington, D. C., C. Worth Rowley, Boston, Mass., Margaret H. Brass, Washington, D. C., Alfred Karsted, Edward M. Feeney, Boston, Mass., Morton Myerson, Brookline, Mass., Laurence S. Flaherty, Somerville, Mass., Herbert F. Peters, Falls Church, Va., Roy N. Freed, Leominster, Mass., Special Attys. for the United States, H. Graham Morison, Asst. Atty. Gen., and Gerald J. McCarthy, Special Asst. to Atty. Gen., of Mass., for plaintiff.

John L. Hall, Robert Proctor, Claude R. Branch, Charles P. Curtis, John B. Reigeluth, Conrad W. Oberdorfer, John M. Hall, Boston, Mass., of Choate, Hall & Stewart, Boston, Mass., Walter Powers and Bertram H. Loewenberg, Boston, Mass., of Sherburne, Powers & Needham, Boston, Mass. (Theodore Kiendl, on the brief), for defendant.

WYZANSKI, District Judge.

Findings of Fact, Conclusions of Law, and Opinions.

## I.

### Introduction.

December 15, 1947 the Government filed a complaint against United Shoe Machinery Corporation under § 4 of the Sherman Act, Act of July 2, 1890, c. 647, 26 Stat. 209, 15 U.S.C.A. § 4 in order to restrain alleged violations of §§ 1 and 2 of that Act, 26 Stat. 209, 50 Stat. 693, 15 U.S.C.A. §§ 1, 2.

Stripped to its essentials, the 52 page complaint charged, *first,* that since 1912 United had been "monopolizing interstate trade and commerce in the shoe machinery industry of the United States" [Par. 27 (a)]. This first general charge was then subdivided, as it were, into these charges: (a) "monopolizing the manufacture and distribution in interstate commerce of all major shoe machines, except upper stitching and cement sole attaching machines" [Par. 27(b)]; (b) "attempting to monopolize the manufacture and distribution in interstate commerce of cement sole attaching machines" [Par. 27(b)]; (c) "monopolizing the manufacture and distribution in interstate commerce of numerous minor machines" [Par. 27(c)]; (d) "attempting to monopolize the manufacture and distribution in interstate commerce of * * * minor shoe machines" [Par. 27(c)]; and (e) "monopolizing the manufacture and distribution in interstate commerce of parts used in shoe machinery leased by United" [Par. 27(d)]. The *second* principal charge laid by the complaint was that United had been (a) "monopolizing the distribution in interstate commerce of numerous * * * shoe factory supplies" and (b) "attempting to monopolize the distribution in interstate commerce of * * * other such supplies" [Par. 27(e)]. *Third,* the complaint alleged United was "attempting to monopolize and monopolizing the manufacture and distribution in interstate commerce of tanning machinery used in the manufacture of shoe leather" [Par. 27(f)].

In support of this three-pronged attack, directed to shoe machinery, shoe factory supplies, and tanning machinery, the Government set forth detailed allegations with respect to acquisitions, leases, patents, and a host of other aspects of United's business. The part of this opinion containing findings of fact sets forth, in the same order as does the complaint, the Government's allegations concerning, and this Court's finding upon, each of these aspects.

After stating its charges, the Government prayed for an adjudication of United's violations of both § 1 and § 2 of the Sherman Act; an injunction against future violations; a cancelation of United's shoe machinery leases; a requirement that United offer for sale all machine types "manufactured and commercialized by it and be enjoined from leasing shoe machinery except upon terms * * * approved by the Court"; a requirement that, on such terms as the court may deem appropriate, United make available to all applicants all patents and inventions relating to shoe machinery; an injunction against United manufacturing or distributing shoe factory supplies; a cancelation of exclusive contracts governing shoe factory supplies; and a divestiture of United's ownership of virtually all branches and subsidiaries concerned with shoe factory supplies or tanning machinery.

Defendant answered seasonably, denying all the significant allegations, and relying upon the judgments rendered by the Supreme Court of the United States in an earlier case brought against this company's predecessor under the Sherman Act, 15 U.S.C.A. §§ 1–7, 15 note, United States v. United Shoe Machinery Company of N. J., 247 U.S. 32, 38 S.Ct. 473, 62 L.Ed. 968 and another case against this company under the Clayton Act, 15 U.S.C.A. § 12 et seq., United Shoe Machinery Corp. v. United States, 258 U.S. 451, 42 S.Ct. 363, 66 L.Ed. 708.

A trial of prodigious length followed. The court attempted to shorten the hearings by requiring defendant in advance of trial to submit to the Government's exhaustive requests for discovery, by requiring the Government at the opening of its case to file a brief correlating all its proposed evidence, by encouraging the use of sampling

devices, and by insisting that the Government should, in formal answers, indicate in each branch of the case on what evidence it principally relied. Nonetheless, the hearings took 121 days and covered 14,194 pages of transcript and included the offer of 5512 exhibits totalling 26,474 pages (in addition to approximately 150,000 pages of OMR's and over 6,000 soft copies of patents) and 47 depositions covering 2122 pages. At the close of the evidence the Court asked for briefs, and requested findings of fact and conclusions of law. The Government offered briefs totalling 653 pages, and requests totalling 667 pages. United submitted briefs totalling 1240 pages, and requests totalling 499 pages.

■ In an anti-trust case a trial court's task is to reduce, as far as fairness permits, a complex record to its essentials, so that the parties, the Supreme Court, other courts, the bar, and the general public may understand the decree, and may recognize the premises on which that judgment rests. It is not the Court's duty to make a precise finding on every detail of four decades of an industry. It is not its duty to approach the issues as an historian, an archaeologist [See A. N. Hand, Trial Efficiency pp. 31, 32, Business Practices Under Federal Antitrust Laws, 1951 Symposium, N. Y. State Bar Assoc.], an economist, or even a master appointed to settle every factual dispute. A trial judge who undertakes such tasks will unnecessarily sacrifice the rights of litigants in other cases clamoring for attention. Moreover, he will encourage just that type of extravagant presentation which has come to plague the field of anti-trust law. Hence this opinion is to be construed as denying on the ground of immateriality every request not granted.

Endeavoring to keep within reasonable and readable limits, this opinion, after this introductory part, sets forth in Part II findings of fact addressed to (A) defendant's corporate structure, (B) fundamentals of shoe manufacture, (C) aspects of the shoe manufacturing industry, (D) a definition of the shoe machinery market relevant to this case, (E) defendant's share of that market, (F) acquisition of property and patent rights, (G) restrictive agreements, (H) leasing, (including written provisions, unwritten practices, service, effect of these provisions and practices on United, its lessees, and its competitors, and United's pricing policy), (I) research, (J) policing of competition, (K) patents, (L) secondhand machinery, (M) shoe machinery parts, (N) shoe machinery supplies, and (O) tanning machinery. The aforesaid sections F to O follow the order of the Government's complaint, and in no sense reflect order of importance. Part III considers questions of law pertinent to defendant's alleged violations of the Sherman Act; Part IV, questions of remedy.

II.

[The ordinary reader can skip the whole of Part II, since its gist is summarized at the start of Part III. The role of Part II is primarily to dispose of 1166 printed pages of Requests for Findings.]

### Findings of Fact.

A. Defendant's Corporate Structure.

February 7, 1899 United Shoe Machinery *Company* was formed and took over the business of Goodyear Shoe Machinery Company, International Goodyear Shoe Machinery Company, Consolidated & McKay Lasting Machine Company and McKay Shoe Machinery Company. March 1899, it acquired the business and property of Eppler Welt Machine Company and International Eppler Welt Machine Company. This phase of United's history has been explored in the Sherman Act case reported in D.C., 222 F. 349 and 247 U.S. 32, 38 S.Ct. 473, 62 L.Ed. 968. No material new facts respecting this early period were shown in the present proceedings.

By merger in 1917, this defendant, United Shoe Machinery *Corporation,* a New Jersey corporation, organized on May 2, 1905, became the successor of United Shoe Machinery Company. The business now conducted by United Shoe Machinery Corporation has been continuous since the organization of United Shoe Machinery Company on February 7, 1899, and for the purposes of this case no distinction usually need be made between the

enterprise formerly conducted by it and its predecessor. The enterprise is therefore usually hereafter referred to as United whether the reference is collective to the several corporations prior to 1917 or to the defendant alone after that date. The predecessor is sometimes referred to as the United Company.

United and its subsidiaries, viewed collectively, are engaged in the development, manufacture, and distribution of shoe machinery and parts for that machinery; the servicing of that machinery; the manufacture of shoe factory supplies; and the distribution of those and other shoe factory supplies.

United manufactures at its main factory at Beverly, Massachusetts, all its shoe machinery, except treeing machines, tree feet, and irons, which it manufactures under the name of O. A. Miller Treeing Machine Company, at Plymouth, New Hampshire. Before January 1950 it manufactured certain machines under the name of Booth Brothers Company, at Rochester, New York; but in 1950 it transferred those manufacturing operations to Beverly.

Through branch factories, United itself manufactures dies, at Binghamton, N. Y. and St. Louis, Mo., eyelets, under the name of J. C. Rhodes & Co. at New Bedford, Mass. and the S. O. & C. Co. at Ansonia, Conn., awls and drivers, under the name of United Awl & Needle Co. at West Medway, Mass., shanks, under the name of United Shank & Findings Co. at Whitman, Mass. and Plymouth, N. H., and boxboard and fibreboard, under the name of Davis Boxboard and Fibreboard Division at West Hopkinton, N. H.

United has a majority of the voting stock of the following subsidiary corporations: B. B. Chemical Co., manufacturers of cements, blacking, adhesives, inks, stains, finishes, re-inforcing materials, waxes etc.; S. A. Felton & Son Co., brushes; Hoague-Sprague Corp., shoe-boxes, shoe box blanks, and box forming machines; Fred W. Mears Heel Co., Inc., wood heels and wedge blocks; Shoe Form Co., Inc., plastic shoe and hosiery forms, plastic utility boxes, and fish hooks; Shoe Lace Co., shoe laces; The Turner Tanning Machinery Co., tanning machinery; United Last Company, shoe lasts and bowling pins; W. W. Cross & Co., Inc., cut tacks and nails; and Krippendorf Kalculator Co., supplier of technical services for shoe factories.

United owns about 20% of the voting stock of Tubular Rivet and Stud Company, manufacturers of hooks, rivets, and grommets. Defendant and E. I. du Pont de Nemours Company each own one-half of the voting stock of Celastic Corporation, manufacturers of celastic material and celastic box toes.

At February 29, 1950 United and controlled subsidiaries had 6274 employees. In the five fiscal years ending February 28, 1946, 1947, 1948, 1949, and 1950, United's assets, as reported to shareholders, fluctuated between 103 million dollars and just over 105 million dollars; earnings before federal taxes between 9.4 and 13.5 million dollars; and earnings after federal taxes between 6.2 and 8.79 million dollars.

B. Fundamentals of Shoe Manufacture.

In relation to this case it is necessary only to summarize certain aspects of shoe manufacture. Basic facts are that shoes are made to provide an approximate fit for every foot; no two feet are alike; consumers wish shoes for widely varying purposes, of widely differing styles, and of widely differing materials. Shoe styles have become increasingly varied as shoes have developed to serve not only strictly utilitarian, but also aesthetic, purposes, which alter as fashion alters.

Almost all shoes are made over wooden lasts. Lasts are made in graded sizes, and in models appropriate for the particular type of last style desired by the shoe manufacturer.

A shoe consists principally of the upper and the bottom. The shoe upper (of which the main components are the tip or toe, vamp, quarter, tongue, backstay, counter, box toe, lining, and doublers) is usually made from leather, though other fabrics are also used. Leather characteristics vary widely not only between skins of different types, but even in different areas of

the same skin. There is less variation in fabrics. The parts of the shoe bottom (of which the main components are the insole, outsole, heel, and shank-piece, and in some shoes the mid-sole and platform) are made sometimes of leather, and sometimes of other materials. Fastening operations are made by tacks, nails, wire, cement, thread, or fibre.

Shoe manufacturing proceeds by cutting parts from flat stock, joining them together as sub-assemblies, and shaping them over a last. The successive steps are performed differently in the manufacture of different shoes, but, so far as concerns this case, it will be sufficient to state that the steps often are performed, in succession, in the upper-cutting room, the upper-fitting room, the stock-fitting room, the lasting room, the bottoming room, the making room, the finishing room and the treeing room.

There are at least 18 principal shoe manufacturing processes, each of which involves distinctive operations in lasting or sole attaching or both. Those processes principally in use are: McKay, turned shoe, pegged shoe, nailed shoe, screwed shoe, Goodyear welt, McKay welt, single-sole stitchdown, two-sole stitchdown, three-sole stitchdown, prewelt, lock-stitch, cement shoe, cement welt, slip-lasted, soft-sole, rubber shoe, and moccasin.

Shoes for every known end use are manufactured by more than one principal manufacturing process. Each shoe manufacturer may vary the steps and operations used in the various processes according to his preferences, the materials used, the type of shoe, the profit-making potential, and many other variables.

Shoe manufacture is a long chain of detail operations, each preparatory to a succeeding operation and often requiring individual correction or adjustment. The final goal is the production of pairs of shoes of uniform and agreeable appearance, and appropriate fitting characteristics. This requires progressive correction of inaccuracies due to lasts, materials, industry practices, and operator performance. Such correction makes the manufacture of shoes different from the usual fabrication and assembly process current in many other types of manufacturing industry.

## C. Aspects of The Shoe Manufacturing Industry.

Since machines were introduced, beginning with the advent, during the Civil War period, of the first McKay machine, shoe production has steadily risen. In 1899, 217 million pairs were produced; in 1927, 367; in 1937, 424; in 1947, 485. Peak all-time production was reached in 1946 at 529 million pairs.

There is no evidence that this increased production has been accompanied by an increase in the *number* of machines. In fact, the market for the more complex and expensive machines may have contracted.

In 1911 the number of shoe manufacturing enterprises was 1300; in 1927, 1377; in 1937, 993; in 1947, 1462. Shoe factories are located in over 30 states. In 1947, 437 were in Massachusetts, 391 in New York, 122 in Pennsylvania, and 121 in Missouri. No other state had more than 100. In 1947, there were 664 known factories having capacity of 1,000 pairs per day or less; 226, between 1,000 and 2,000 pairs daily; 107, in excess of 5,000 pairs daily.

While there are a few shoe manufacturers such as International Shoe Corporation and General Shoe Corporation with assets, employment rolls, and bargaining power comparable to defendant, the overwhelming majority of concerns are small in production, assets, and employment rolls. The industry tends to disperse to small towns and to migrate gradually westward and southward.

It has been easy to enter the shoe manufacturing business. Many have started with small capital; and some, from a small start have become large producers. The shoe manufacturing business has been highly competitive with respect to style, cost, choice of processes, production techniques, and other factors.

There is no standard set or number of shoe machines which every shoe manufacturer must have. He not only has personal

choice as to which process, processes, or sub-processes he will use, but he has wide choice as to whether a particular operation will be performed by hand, or by one or another type of machine. Some machine types have been familiar for a long time; others have been newly called into being by a new process or sub-process; others have been adapted to a different process. The consequence is that the concept of "shoe machinery" includes complicated relationships between different types of machines: in function, some types are parallel to other types; some are sequential to other types; and occasionally a pair of types which are competitive when used in two different shoe manufacturing processes, are complementary when used in a single shoe manufacturing process.

Moreover, shoe machinery types may be as simple as a marking machine or a tack-detecting machine; or as complicated as a pulling over, toe lasting, heel seat lasting, or side lasting machine. With respect to the more complicated machines these generalizations may safely be made. To design them requires advanced engineering skill, familiarity with the problems of shoe-making, and generally, prolonged expensive research. Such complicated machines must have versatility and adjustability to meet varying last-styles, size-width combinations, combinations of materials and fastening materials, and shoes processed with varying degrees of skill. These machines will work with greatest satisfaction if shoes presented to them have been properly prepared in preliminary processes, and sometimes by appropriate auxiliary machines. No matter how skillfully designed, these complicated machine types will require frequent repair service. And breakdowns of such machines should be promptly attended to, because, in the shoe manufacturing industry, stoppages are particularly costly. The shoe manufacturer produces in small units or case lots; he must meet a market notoriously volatile, seasonal, and fashion-ridden; his consumer is traditionally impatient; and his own labor cannot be efficiently and economically used if there is much down time. Moreover, there is a high degree of interdependence of machine operations in each factory, which accentuates the factors stressed in the last sentence. In support of the foregoing generalizations, defendant offered a wealth of corroborative detail. Recitation of that detail is unnecessary for the Government challenges not the accuracy, but the relevance of the generalizations.

### D. A Definition of The Shoe Machinery Market Relevant to This Case.

The Government in paragraph 27(a) of its complaint charged defendant with monopolizing apparently *all* of the "interstate trade and commerce in the shoe machinery industry," and then in the following sub-paragraphs suggested that there are four appropriate sub-markets: (1) major shoe machines, except upper stitching and cement sole attaching machines; (2) cement sole attaching machines; (3) minor machines made by United; and (4) other minor machines.

If it were important, it would not be difficult to find that there were various sub-markets, each of which as a matter of fact constituted an identifiable "part of the trade or commerce among the several States" within the meaning of § 2 of the Sherman Act. But in this case it is expedient to move directly to the question whether there is a more comprehensive market including not all of the trade in shoe machinery, but all of that trade, except dry thread sewing machinery.

For the moment the exception may be disregarded, and attention focused on the propriety of broadly including in one aggregate market all other types of shoe machinery. In the previous section dealing with characteristics of the shoe machinery industry, it was noted that some types of machines perform parallel functions, some sequential functions in relation to each other, and that some types are used only in one process, others in more than one. But regardless of the relationship of a particular machine type to another type or to a particular process, they are in the same market, because all processes are in competition with one another. Each shoe manufacturer, regardless of what class of

shoe he makes, is aiming for that part of the ultimate consumer's dollar that is spent on footwear, and the processes that he uses, and the machines he selects, therefore, compete with the processes and machines which others select. Indeed, United itself repeatedly emphasizes in its requests for findings how highly competitive the shoemaking industry is in production techniques and other factors.

Furthermore, United, by itself offering virtually all machine types (except dry thread sewing machines), helps to define the shoe machinery market. To define a market in terms of what the most important producer offers does not involve circular reasoning. For the problem of defining a market turns on discovering patterns of trade which are followed in practice.

Nor is it inappropriate so to define the market as to exclude dry thread sewing machinery. Again, without any circular reasoning, this exclusion might be rested on the fact that the dominant and most experienced shoe machinery manufacturer, United, does not offer such dry thread sewing machinery, and shows in its records, its internal and external communications, and its research and other activities that such sewing machinery is apart from the broad field of other shoe machinery. But the exclusion rests also on additional bases. No major manufacturer of sewing machinery makes other types of shoe machinery; and no major manufacturer of other types of shoe machinery makes sewing machinery. Sewing machinery, unlike other shoe machinery, is used in many industries other than shoe manufacture, and its manufacture does not require detailed knowledge of the whole art of shoe making.

E. Defendant's Share of That Market.

As an aid to calculating United's share of the market, plaintiff offered records of machines in shoe factories as of certain dates. These were the Outside Machine Installation Reports (OMIR's), Outside Machine Supplemental Reports (OMSR's), and Outside Machine Removal Reports (OMRR's), collectively referred to as OMR's.

Each of the OMIR's and OMSR's reports a particular shoe machine not made by United, and said to be in a particular shoe factory. The report is on a form with spaces for recording its date and serial number, the name and address of the shoe manufacturer involved, the title of the outside machine, the name of its manufacturer, its serial number, the name of the company installing the outside machine, the date of installation, the terms upon which it was installed, the payments made by the shoe manufacturer, whether the outside machine is in use, the shoe manufacturing function it performs, and the type of shoe upon which it is used.

The OMRR's recite information on the removal of an outside machine, the date of its removal, whether it has been replaced by another machine or hand labor, and the reasons for its removal.

There are about 76,000 OMR's in United's files, all but 3 of which were prepared by United's employees, usually upon the basis of what they saw, sometimes upon the basis of what they were told by the supposed users of the machines, rarely from other sources.

OMR's are prepared in quintuplicate. One copy goes to United's Patent Department, another to its Research Division, a third to the interested operating department, and two are filed by the Miscellaneous A Department. The record of this case abounds in instances where these OMR's have been used in United's business by the Miscellaneous A Department in preparing weekly bulletins, by United's operating departments in preparing annual reports, by personnel in the Research Division, by the Patent Department and by others. Therefore, regardless of whether the author of a particular OMR himself observed what he reported, the OMR is admissible in evidence as an adoptive admission. United States v. United Shoe Machinery Corp., D.C.Mass., 89 F.Supp. 349.

In considering the reliability, as distinguished from the admissibility, of the OMR's, these factors deserve mention. The OMR's cover only the factories to which United's representatives have access. Yet, without laboring the point, it is clear that these are factories where more than 95% of all American shoes are made. The OMR's are not absolutely current with respect to installations and removals of competitors' machines; but the constant checking by United's representatives keeps the inventory at least as up-to-date as is apt to be the case with any other industry-wide reporting system. The OMR's do not report accurately the details in any particular shoe factory, as was evident from 45 depositions taken in 1948–1949; but these depositions also show that the aggregate industry picture was substantially as portrayed in the OMR's—such discrepancies as existed being due, in part, to the fact that the sample was over-weighted in favor of factories using the cement process. Furthermore, the picture given by the OMR's as to one very important area, that in which United competes with Compo, was proved to reflect with high accuracy the number of machines Compo had competing with United—for the testimony of Compo's own witnesses tended to corroborate the OMR's. Most important of all, is United's own use of these OMR's in connection with business decisions at the operating, patent, and research levels. They enter, albeit often indirectly, into the planning of production, the setting of terms of distribution, and a host of other business judgments. Although explicit use of OMR's usually occurs at a subordinate level, and not by officers or the general manager, nonetheless the management makes its decisions on the basis of subordinates' recommendations, which the latter make partly on the basis of the OMR's. When a business allows its own important judgments constantly to be affected by a statistical survey unflaggingly made, diligently kept current, and repeatedly consulted at least by subordinate advisers to the officers, then the statistical material may be used by a court to some degree as reliable evidence against the business.

For the foregoing reasons, the Court finds that, subject to minor corrections not affecting the general picture, the following tabulation, drawn from the OMR's, approximately reflects the relation between United's machines and competitors' machines in American shoe factories about May 1, 1947.

USMC AND OTHER SHOE MACHINES OUTSTANDING

IN FOOTWEAR FACTORIES AS OF ABOUT 5/1/47.

| MACHINE TYPES | USMC Machines | Others | Total | USMC Share of Total |
|---|---|---|---|---|
| 1. Clicking | 16,346 | 539 | 16,885 | 97% |
| 2. Eyeletting | 2,296 | 545 | 2,841 | 81% |
| 3. Cutting Press (Dinking) | 3,319 | 316 | 3,635 | 91% |
| 4. Pulling Over | 3,145 | 19 | 3,164 | 99% |
| 5. Lasting—Total | 12,561 | 796 | 13,357 | 94% |
| Bed Lasting | 5,233 | 54 | 5,287 | 99% |
| Hand Method Lasting | 1,763 | 52 | 1,815 | 97% |
| Heel Seat Lasting | 1,463 | 3 | 1,466 | 99% |
| Platform Cover | 361 | 332 | 693 | 52% |
| Pre-Welt Lasting | 99 | 90 | 189 | 52% |
| Staple Side Lasting | 2,627 | 6 | 2,633 | 99% |
| Stitchdown Lasting | 542 | 259 | 801 | 68% |
| Welt Toe Lasting | 473 | ... | 473 | 100% |
| 6. Welt Sewing | 1,470 | 40 | 1,510 | 97% |
| 7. Inseam Trimming | 595 | 3 | 598 | 99% |

| | Machine Types | USMC Machines | Others | Total | USMC Share of Total |
|---|---|---|---|---|---|
| 8. | Outsole Laying ............... | 1,029 | 99 | 1,128 | 91% |
| 9. | Rough Rounding ............. | 1,430 | 31 | 1,461 | 98% |
| 10. | Outsole Stitching ............. | 3,537 | 309 | 3,846 | 92% |
| 11. | Cement Sole Attaching........ | 870 | 1,319 | 2,189 | 40% |
| 12. | Littleway Lockstitch .......... Sole Sewing | 580 | 58 | 638 | 91% |
| 13. | McKay Chainstitch ........... Sole Sewing | 498 | 65 | 563 | 88% |
| 14. | Loose Nailing ................ | 1,224 | 23 | 1,247 | 98% |
| 15. | Outsole Leveling ...·.......... | 1,082 | 29 | 1,111 | 97% |
| 16. | Fibre Fastening .............. | 470 | ... | 470 | 100% |
| 17. | Heel Attaching—Total ........ | 3,168 | 230 | 3,39ξ | 93% |
| | Leather & Rubber........... Heel Attaching | 1,682 | 27 | 1,709 | 98% |
| | Wood Heel Nailing........... | 814 | 172 | 986 | 83% |
| | Wood Heel Attaching......... | 672 | 31 | 703 | 96% |
| 18. | Slugging .................... | 773 | 72 | 845 | 91% |
| | Other Machine Types Listed By USMC Departments | | | | |
| 19. | Cement Shoe ................ | 3,415 | 2,130 | 5,525 | 63% |
| 20. | Cutting Die ................. | 673 | 87 | 760 | 89% |
| 21. | Eyeletting .................. | 839 | ... | 839 | 100% |
| 22. | Fitting Room ............... | 13,555 | 9,730 | 23,285 | 58% |
| 23. | General .................... | 19,416 | 7,781 | 27,197 | 71% |
| 24. | Goodyear ................... | 7,722 | 1,077 | 8,799 | 88% |
| 25. | Heeling .................... | 3,502 | 695 | 4,197 | 83% |
| 26. | Lasting .................... | 3,192 | 438 | 3,630 | 88% |
| 27. | Littleway .................. | 853 | 50 | 903 | 94% |
| 28. | Metallic ................... | 3,380 | 986 | 4,366 | 77% |
| 29. | Pulling Over ............... | 4,138 | 138 | 4,276 | 97% |
| 30. | Rubber Shoe ............... | 709 | 769 | 1,478 | 48% |
| | Totals .................... | 115,787 | 28,374 | 144,141 | |

At the Court's suggestion, the Government took and offered in addition to the OMR's depositions of 45 shoe manufacturers operating 55 factories. The Court arbitrarily selected from a standard directory of shoe manufacturers, the first 15 names that began with the first letter of the alphabet, the first 15 names that began with the eleventh letter of the alphabet, all 8 of the names that began with the twenty-first letter of the alphabet, and the first seven of the names that began with the twenty-second letter of the alphabet. This sample covers 3 per cent of the shoe manufacturers. The sample includes small and large factories, and concerns manufacturing shoes according to substantially the most popular shoe manufacturing processes. Probably the sample unintentionally over-represented machines used in the cement process, somewhat under-represented those in the Goodyear welt process, and greatly under-represented those used in the stitchdown, Littleway Lockstitch, and some minor processes. But these and any other distortions discussed at this bar, would have the effect of showing United with a *smaller* percentage of the aggregate market than a better devised sample. And in criticising this sample, United has not suggested, much less offered, a preferable sample. If antitrust trials are to be kept manageable, samples must be used, and a sample which

is in general reasonable should not be rejected in the absence of the offer of a better sample. For the foregoing reasons, the Court finds that, subject to minor corrections not affecting the general picture, the following tabulation, drawn from the depositions, approximately reflects the relation between United's machines and competitors' machines in American shoe factories in the summer of 1949.

which United had at the time the complaint was filed, more is needed than the OMR's and the depositions which show only machines in position. But much of this additional material is in the record. It includes United's own estimate in words, and in rates set, of the relative importance to the shoe industry of different machine-types; United's own statements as to the degree to which each machine-type is use-

## USMC and Other Shoe Machines Outstanding

### In 55 Selected Shoe Factories

| | Machine Types | USMC Machines | Others | Total | USMC Share of Total |
|---|---|---|---|---|---|
| 1. | Clicking | 568 | 10 | 578 | 98% |
| 2. | Eyeletting | 48 | 12 | 60 | 80% |
| 3. | Cutting Press | 47 | 12 | 59 | 78% |
| 4. | Pulling Over | 89 | .. | 89 | 100% |
| 5. | Lasting | 403 | 17 | 420 | 96% |
| 6. | Welt Sewing | 36 | .. | 36 | 100% |
| 7. | Inseam Trimming | 15 | .. | 15 | 100% |
| 8. | Outsole Laying | 18 | 1 | 19 | 95% |
| 9. | Rough Rounding | 35 | .. | 35 | 100% |
| 10. | Outsole Stitching | 100 | 4 | 104 | 96% |
| 11. | Cement Sole Attaching | 19 | 60 | 79 | 24% |
| 12. | Littleway Lockstitch | 20 | 2 | 22 | 91% |
| 13. | McKay Chainstitch | 11 | 2 | 13 | 85% |
| 14. | Loose Nailing | 20 | .. | 20 | 100% |
| 15. | Outsole Leveling | 41 | 3 | 44 | 93% |
| 16. | Fibre Fastening | 6 | .. | 6 | 100% |
| 17. | Heel Attaching | 110 | 6 | 116 | 95% |
| 18. | Slugging | 18 | 11 | 29 | 62% |
| | *Other Machine Types Listed By USMC Departments* | | | | |
| 19. | Cement Shoe | 95 | 139 | 234 | 41% |
| 20. | Cutting Die | 19 | 4 | 23 | 83% |
| 21. | Eyeletting | 5 | .. | 5 | 100% |
| 22. | Fitting Room | 587 | 726 | 1,313 | 45% |
| 23. | General | 993 | 312 | 1,305 | 76% |
| 24. | Goodyear | 191 | 38 | 229 | 83% |
| 25. | Heeling | 104 | 20 | 124 | 84% |
| 26. | Lasting | 105 | 13 | 118 | 89% |
| 27. | Littleway | 31 | 1 | 32 | 97% |
| 28. | Metallic | 108 | 91 | 199 | 54% |
| 29. | Pulling Over | 160 | 7 | 167 | 96% |
| 30. | Rubber Shoe | 1 | .. | 1 | 100% |
| | Totals | 4,003 | 1,491 | 5,494 | |

To make a highly accurate computation of the share of the shoe machinery market

ful in each of the different processes; the periodic flow of both sold and leased ma-

chines from United; and the periodic flow of revenues from both sold and leased machines. These are sufficient for calculating the share of a market of diverse products of which some are sold, and some leased. The calculation, for example, would not need to be based exclusively upon United's share of the value of the outstanding stock of machines; it could be estimated from United's share of the value of current services flowing from those machines, or on some hybrid method combining stock and flow.

There is no advantage in a Court discussing these or other different methods of calculation and applying them with minute care to the subsidiary facts in the record. For the evidence is all in one direction. United offered no evidence; did not suggest that some other method of sampling should be used; and does not now offer any method of calculation. This, of course, does not relieve the Government of its burden of proof. But, on the uncontradicted evidence, it is transparent that, by any measuring rod, United supplies 75% to 95% of the total current demand for shoe machinery, exclusive of dry thread sewing machinery. Different methods of weighting the various factors would produce different results; but no reasonable, qualified person would, by any rational process, reach a figure outside that range; and probably most methods would reach a figure close to the middle of it. Moreover, even though this high figure is not attained in every part of the market, nonetheless the figure may be fairly used since United supplies in every significant generic class of shoe machinery, except machinery used in the cement process, and in rubber shoe manufacturing, and of course, excepting dry thread sewing machinery, far more than 50% of the demand. In short, it is not inaccurate in this market to say United has a 75-95% share; and it probably would be accurate to say an approximately 85% share.

Before turning to the several different alleged means of monopolizing, (such as post 1920 acquisitions, leases, and other business practices,) of which the Government complains, it should be noted that by far the most important means by which United originally achieved its share of the market and its market power was that set of transactions in 1899 by which it brought under one corporate control the business of the so-called constituent companies. But these transactions have already been adjudicated in favor of United, and are not now in issue. The issues of fact now under review relate to how United's market power has been maintained and exercised since the earlier adjudication. This requires a consideration of United's acquisitions, agreements, leases, patents, research, and other business practices.

### F. Acquisition of Property and Patent Rights.

In its complaint the Government listed 15 examples of United "disabling actual or potential competitors by the acquisition of their assets and the employment of their key men." [Pars. 29–51]. The trial brief added 15 more. The earliest of these 30 transactions occurred in 1916 or 1917; the latest in 1938, 9 years before the Government filed this complaint. All the property and patent acquisitions taken together appear to have involved just over 3½ million dollars. This total is probably less than ⅙th of what was expended in the same time for research.

Under the Court's prodding, the Government listed as the four most important acquisitions those involving General Shoe Machinery Company, Alexander E. Little, Beacon Folding Machine Company, and C. C. Blake, Inc. Probably it would be satisfactory to state summarily the findings on each of these four instances. But the immediately succeeding paragraphs give the first instance in some detail not only because so much testimony was addressed to it, but because the Government contended (a contention which the Court expressly rejects) that there was a covert, discreditable design not immediately apparent.

### (1) General Shoe Machinery Company.

General Shoe Machinery Company was organized before 1916. In 1921 its shares of stock were held as follows: 575, by International Shoe Company, one of the country's largest shoe manufacturers; 235,

by General's president; 500, by an independent attorney, Gladney; 1500, by Gladney's client, Ferguson; 583, by others. A reason for International's original interest was its dissatisfaction with United's then form of lease. After the Government secured a decree against United in the Clayton Act case, 258 U.S. 451, 42 S.Ct. 363, 66 L.Ed. 708, and after United's subsequent change in its leases, and in the face of General's losses in every year after 1917, International was unwilling to give General further financial backing. General could not proceed without outside aid.

International's president, Rand, approached United on March 9, 1923. At that time, General's commercial business was derived principally from its business in treeing machines, of which it leased over 100, mostly to International. But General's inventor, Ballard, had made other inventions, including a welter, a sole layer, channeling machines, upper trimming machines, inseam trimming machines, hand tackers, and a device for creasing vamps. Moreover, from these inventions General had developed a complete line of shoe machines which was currently producing a cheap and a medium grade of welt process shoes at the Spencer, Massachusetts plant of Groat Shoe Company.

United's president, Winslow, did not commit himself in March or later in 1923 to acquire all, or substantially all General's assets. He was mindful of the risks of being charged with an anti-trust violation.

March 9, 1923, United wrote General a letter that United had information that General's machines at the Groat factory were infringing United's patents. In accordance with permission given by General's representatives, United's representatives examined the Groat factory machinery and the General patents. United's representatives reported that Ballard's invention was an improvement on United's existing two types of channeling machines, and that Ballard's application antedated United's but that machines embodying Ballard inventions would infringe United's patent, and that, therefore, there was a blocking situation. These representatives also reported that Ballard's inventions in regard to upper trimming machines, inseam trimming machines, and hand tackers would constitute improvements in United's machines. United purchased the foregoing Ballard inventions and application, any rights General had to Ballard's future inventions, and a non-exclusive license under Erikson patent No. 1,084,259 with respect to a heel-breasting machine. United paid General $100,000 on June 8, 1923, and $300,000 more on August 11, 1923. When General disposed of these assets, it terminated Ballard's employment but not his position as director. Ballard applied to United for employment, and received it.

After these 1923 transactions, General continued its development work on its welter and its sole layer, experimented with the former in International's factories, and installed the latter at International and two other shoe manufacturers. Its power treeing machine business virtually ceased. It sold 128 of these machines to International which had been leasing them. It sold similar machines to other lessees. It made almost no new leases of similar machines in 1926 and 1927; so that by October 31, 1927 only 32 such machines were on lease.

In February 1927 Rand asked United to buy General's assets; but Winslow, United's president, refused to make such an agreement. In July 1927 Rand told Winslow International was considering liquidating General and taking over what was necessary to maintain such General machines as International owned. Rand asked for Winslow's advice, and Winslow said he did not know what help he could give but he would be glad to look over a list of General's assets. Rand sent Winslow on July 28, 1927 a list of General's assets, and on September 1, and again on September 20, a request for an appraisal by a United employee. December 27 Rand asked for the appraisal. December 31, Winslow, having seen the appraisal by United's employee, Booth, wrote Rand that the Booth report would go forward but Winslow knew the figures would be disappointing to Rand as they were to him. January 31, 1928 Rand telegraphed Winslow that International was purchasing the assets and want-

ed United to service the machines. In March 1928 International purchased for $150,000 General's assets, except its machine tools, transmissions, small tools, furniture, fixtures, raw material, and shipping supplies.

March 23, 1928, United paid International $75,000. $35,000 was for spare parts, and the tools necessary to make additional spare parts, for General treeing machines. $40,000 was for non-exclusive licenses under General's Ballard patents and a confirmatory license under General's Erikson patent. These licenses covered improvements in treeing machines, inventions which later were embodied in United's Model K welter and United's ORL stitcher, and inventions which led to the development of two types of breasting and automatic heel compressing machines.

May 1, 1928 United's British subsidiary paid International $75,000 for assets in England which International had bought from General.

On the basis of the detailed facts stated, and reasonable inferences therefrom, these are found to be the ultimate facts with respect to the acquisitions by United in 1923 and 1928 of certain assets of General.

United did not initiate either transaction. United's acquisitions were not the reason that General did not survive as an independent entity. By 1923, unless it could acquire outside capital, which was not shown to be available, General had to dispose of some, if not all, of its assets. United did not then make any commitment to acquire General's treeing business, welters, sole layers, or miscellaneous assets, but hired Ballard and bought only those inventions useful in channeling machines, upper trimming, inseam trimming, and hand tacking machines and a non-exclusive license under the Erikson patent with respect to a heel-breasting machine. If in 1923 United contemplated purchase of other General assets, United's plan was indefinite, and contingent on a bargaining situation favorable to United. By 1928 when that favorable situation had developed United did plan to buy for $150,000 General's business of supplying parts for General treeing machines, non-exclusive licenses under various General patents, and General's British tangible assets. Though technically International was not United's agent in acquiring those assets from General and transferring them to United, nonetheless, Booth's role, the matched prices, and like factors justify treating the 1928 transactions as involving, for purposes of the anti-trust laws, a transfer from General to United of the business in treeing machine parts, the non-exclusive licenses, and the British tangibles.

Looked at in their total aspect, the 1923 and 1928 transactions show United's power to acquire, at times and prices convenient to it, inventions of some competitive value. But, in appraising both United's actual intent, and the effect of its acquisition upon the shoe machinery market, it is worth emphasizing that United proceeded in a far from exclusionary manner. In 1923 United ran the risk that General's business in treeing machines, welters, and sole layers, might fall into the hands of potential competitors; and in 1928 United took licenses that were non-exclusive.

#### (2) Alexander E. Little.

In 1921 Little, a shoe manufacturer, and United were both working on the problem of fastening the upper to the insole by means of staples which did not extend through the insole. Little was prosecuting the Reed patents for a shoe and a method of making a shoe; and these applications were of such scope that they would have blocked the Goddu method, then being developed by United. Little, in a small machine shop, had also developed and was using a lockstitch machine and a stapling machine. Examples of these machines were also in the possession of another shoe manufacturer. United was building a lockstitch horn machine.

Little approached United. In 1924 they executed an agreement. Pursuant to that agreement, they formed the Littleway Process Company for the purpose of owning, and granting licenses under, the shoe and method patents of Little. At the same time, United acquired title to a number of applications covering improvements in the Little stapling machine and lockstitch ma-

chine. United paid Little $1 million and got 49% of Little's stock in Littleway Process Company, and an option to buy the remaining 51% which was issued to Little.

United developed and commercialized its own staple lasting and lockstitch machines, and not those of Little. A disagreement followed. In 1927 United purchased for $1.4 million Little's stock in Littleway Process Company, and certain machinery, jigs and tools relating to machines used in carrying out the Littleway process and certain patents and applications relating to those machines and that process.

The Littleway Process Company derived royalties from licenses which about equalled the price United paid for its stock. United has also received revenue from its machines used with the process. In 1946 over 50 million pairs of shoes were staple lasted in accordance with the Littleway process, and over 10 million pairs were staple lasted by such process and lockstitched.

On the basis of the above specific facts, these are the ultimate facts. This was an important acquisition. It represents approximately two-thirds of United's total expenditure for acquisitions in the 22 year period. It covered a technologically and commercially important process from which United would have been blocked; it also covered machine types and shoe making processes which, whether or not inferior to United, were practical and which would have formed either for Little or someone else the nucleus of a significant shoe machinery business. The total effect of the transaction was to eliminate the risk of substantial competition.

(3) *Beacon Folding Machine Company.*

Beacon Folding Machine Company was formed in 1920 by the late T. C. Rowen, Sr. and others. The only machine that it ever offered commercially was a folding machine that folded French cord, or French binding, over the edge of the upper, and there secured it adhesively. It also experimented with skiving and binding machinery.

United in 1921 had 3 patents applicable to folding machines, and it was working on what later became its Rapid Folding Machine, Model G.

When Beacon's folding machine came out in 1921, United informally notified Beacon of its claim that United's 3 patents were infringed. Then in 1923 a United subsidiary sued Beacon for infringement of those patents. After the suit was brought, United's counsel advised United that "the chances are considerably less than even that you would succeed as to any of the patents in suit."

Beacon in 1923 considered selling its business to United. At that time four interferences had been declared in the Patent Office between applications filed by United's inventors and Beacon's inventors. In 1924 United's Patent Department reported that many of the 30 pending Beacon applications contained claims which, if granted, would prevent United from marketing its Model G Folding Machine and its Skiving Machine, Model A.

Meanwhile, Rowen, Sr. became ill. Beacon met severe competition from the Rotary Machine Company; it had to abandon the leasing system and the use of roadmen; it ceased manufacturing gears, springs, main castings, etc.; and it moved its factory to one room. Beacon again offered to sell out to United.

In 1925 Beacon granted to United a license, excluding all except the grantor, in respect of 6 patents and 31 applications; and United granted similar licenses to Beacon in respect of 4 patents (including the 3 patents alleged to have been infringed) and 2 applications. United paid Beacon $80,000 in cash, and agreed to pay royalties up to $75,000. These royalties turned out to be $63,900. United also agreed to buy for $25,000 all patents and applications owned at Rowen, Sr.'s death by his estate or Beacon. And the infringement suit was settled by consent.

In 1926 Rowen, Jr. went to work for United. After Rowen, Sr.'s death, the son asked United to buy Beacon's tangible assets. It did so for $11,000.

Reviewing the whole Beacon situation, the Court finds that United had legitimate

reasons for bringing its infringement suit. Even if United's counsel regarded the chances of success as less than even, he thought that there was "a fighting chance". And no patentee is to be charged with bad faith merely because he is a fighter against odds. Moreover, United had legitimate reasons for settling that infringement suit by cross-licenses and payment of cash. For, unless it secured licenses from Beacon, United might have been unable to market its Model G Folding Machine and its Model A Skiving Machine. But the acquisition of exclusive licenses (exclusive, that is, except against the grantor) cannot be so justified. Such an exclusionary acquisition, followed up by later acquisition of the patents themselves, not only had the effect, but seems to have had the purpose, of preventing competition not by Beacon to be sure, but by possible third parties. This impact on third parties is significant. The impact on Beacon is not significant. For, after Rowen's health began to fail, after United brought its legitimate infringement suit, and after Rotary began competing severely, Beacon itself was never an important factor. Hence nothing turns on United's engagement of Rowen, Jr. or United's purchase for $11,000 of the few tangible assets left at Rowen, Sr.'s death.

### (4) C. C. Blake, Inc.

In 1912 C. Chandler Blake organized C. C. Blake, Incorporated. The company tried to develop welting machinery which would be to some degree automatic. It never got beyond the experimental stage. The original backers withdrew about 1915. A subsequent backer, Godfrey M. Hyams, before his death in 1927 advanced directly, or through a trust, more than $950,000. But by 1924 he had received a practical shoe man's report that the Blake process was not commercially feasible. By 1926 the Blake Company ceased activities. In 1929 it dissolved and conveyed its assets to the Hyams trust, a charity. H. Le Barron Sampson, Esq., the diligent and highly competent executor of Hyam's will and counsel for the Trust, found that the Blake process had not been successful, and that there was no hope of making it successful without large expenditure, and that there

was no known source from which the necessary money could be obtained. He asked United to buy the patents and machines. In 1932 United paid $15,000 for 77 patents, one trade mark, and machines. Neither the patents, nor the trade mark, nor the machines had any appreciable value, except that some of the patents might be infringed by machines which United wished to put out or might subsequently develop, and some of the machines were worth displaying in United's model room.

Since all of the activities of C. C. Blake, Incorporated had ceased 6 years before the sale to United, since the assets including the patents had no significant commercial value, and, since there was no discernible potential user of Blake's developmental work, neither actual nor potential competition was affected by United's purchase.

In 1933 United hired Blake at $2500 a year for an option on any shoe machinery idea which he might have. Since Blake did not develop any valuable inventions in the 2 years he lived thereafter, this contract did not affect actual or potential competition.

### (5) Henne and Preo.

While it is not one of the four instances regarded by the Government as of greatest importance, the Henne and Preo transaction deserves a word. Miss Henne was a shoe manufacturer; Preo was her foreman. They developed, and in 1921 and 1922 offered, to United a method and machinery for attaching wood heels on turned shoes. They had made a heel seat fitting machine and a heel forming machine and had relevant patents and applications. While United had developed in 1913 a machine for fitting heel seats, the machine did not take care of turned seat work, and United's efforts to improve it were blocked by the Henne and Preo patents. Possibly, though less clearly, United's patents blocked Henne and Preo. Instead of exchanging mutual licenses, Henne and Preo offered United its inventions, patents, and machines for $14,000 and a share in the royalties received by United from its licensees of heel seat fitting machines. United agreed in 1923. United in 1926 acquired for $125,000 the outstanding royalty claims of Miss

312

Henne, she having in the meantime acquired Preo's rights, and he having become a United employee. The effect of this acquisition of Henne and Preo's inventions and machines, and Preo's services, was to give United what its own counsel described as "the first * * * commercially successful set of machines for fitting the heel seats for wooden heels." The effect of the transaction, unlike a non-exclusive license (which so far as appears was not offered by Miss Henne or discussed by United), was to exclude from this phase of the shoe machinery market actual successful competition. It also precluded the possibility of this machine type becoming the nucleus of a machinery business competitive with United.

(6) *Summary of the Acquisition Phase of the Case.*

These 5 acquisitions, taken together with the other 25 acquisitions, not set forth in detail, do not show an extensive program of acquisitions. It has already been pointed out that they did not involve much money. Moreover, none of them involved the acquisition of a plant of a shoe machinery company. While there are some exceptions, (such as the machines for attaching wooden heels to shoes developed by Isabelle Henne and John Preo and acquired from them in 1923), generally United did not acquire commercial shoe machines of any importance. The only acquisition of outstanding technological significance was the Littleway process obtained from Little. Most, not all, of the acquisitions centered on relatively second string patents, patent applications and developments.

Often these inventions and developments had been commercial failures, or were in the hands of moribund companies, or were valuable to United chiefly because they removed a patent block, or enabled United to enter a new field.

Yet, it must be added that these acquisitions taken in bulk, as well as the refusal by United to acquire many important machinery and allied businesses offered to it, and listed by Mr. Winslow in his testimony, show that while United does not embrace every opportunity offered, it has such a position in the shoe machinery industry that those in this field who want to dispose of patents, shoe machinery, and the like, turn to it. Moreover, when United does purchase, its interest generally has gone beyond acquiring non-exclusive licenses enabling it to carry on its own research. United has usually acquired such inventions and developments outright. This has laid the ghost of some potential competition.

In sum, the Court finds that acquisitions since 1916 have not been one of the principal factors in enabling defendant to achieve and hold its share of the market. But these acquisitions are an evidence of market power. And there would have been some increased competition against United if it had not had transactions with Little, Henne and Preo, and Beacon Folding Machine Company.

### G. Restrictive Agreements.

The Government in paragraph 52 of its complaint alleged United had "entered into agreements and understandings with various manufacturers of shoe machinery and shoe repair machinery designed to restrict, curtail, and prevent their competition in the manufacture and sale of such machinery." The complaint listed 5 instances. They deserve only brief consideration.

In paragraphs 53 through 55 of its complaint, the Government alleged an agreement with Singer Sewing Machine under which United would refrain from manufacturing and distributing upper fitting machinery, and Singer would refrain from manufacturing any other type of shoe machinery. No such agreement was proved by direct or indirect evidence. Winslow, now Chairman of United, denied that such an agreement existed, and the Court believes him.

Paragraph 56 of the complaint is headed "The Lamson Company". Lamson Company developed in the early 1930's a single rack horizontal conveyor and also a vertical conveyor system. In 1934 United and Lamson entered into an agreement under which (in general) Lamson was to manufacture, market, and lease to the shoe trade,

conveyors; United was to service the conveyors and to collect payment from lessees; United and Lamson were to divide equally costs and revenues from the business, except that royalties and profits on the sale of conveyor systems should be divided 60% to Lamson and 40% to United; and United should pay Lamson $220,000.

The Lamson horizontal system turned out not to be satisfactory; therefore, United stopped distributing it; and now only one is in use. There is no foundation for any suggestion that United was responsible for the failure of the shoe factories to use more horizontal conveyors.

The Lamson vertical system is satisfactory, and United still distributes it.

United's agreement with Lamson gave United control of the servicing of a novel conveyor system, and gave United an interest in the net revenues from the distribution of the system. The conveyor system has not been of great practical consequence, and so it has not in fact contributed in a substantial way to United's position in, or affected competition in, the shoe machinery trade. The transaction, however, does show an example of United embracing an opportunity to establish exclusive relationships in connection with a product it did not itself develop.

Paragraph 57 of the complaint relates to Tubular Rivet & Stud Company. On March 1, 1924 United became the selling agent in the United States for the Tubular Rivet & Stud Company for all its lacing hooks and studs, and, since then, it has installed and serviced Tubular's Hook Setting Machines, which have been distributed under Tubular's own lease agreement. So far as appears, these arrangements are at will, and do not preclude Tubular from giving any would-be competitor of United the right to sell hooks or service machines. In short, the arrangement has not excluded, and does not exclude, competition. Of course, this arrangement like any other non-exclusive distributorship, or non-exclusive system of servicing another's machines, has increased United's offerings available to shoe manufacturers.

Paragraph 58 of the complaint relates to Breuer Electric Manufacturing Company.

Before 1936 Breuer Electric Manufacturing Company manufactured blowers and successfully distributed them to the shoe trade through Brawley as exclusive agent. In November 1935 United bought from Sandt's estate the Sandt patent for a heat blower. Breuer's blower infringed this patent. United complained. In 1936 an agreement among Breuer, Brawley, and United was made by which United bought from Brawley for $1500 its contract as exclusive agent, and Breuer agreed to furnish, at $35 each, blowers to United as exclusive agent for the shoe trade.

On the foregoing facts, neither Breuer nor Brawley could complain, for they were infringers of the Sandt patent. But the problem is whether the United States can complain of United's acquisition of the Sandt patent on the ground that United bought it in order to gain control of the manufacture and distribution of blowers. This acquisition standing alone was not substantial, and would have had no appreciable effect on United's position in, or competition in, the shoe machinery trade. This acquisition taken with all other acquisitions of patents and other kinds of property, shows that to some extent United has maintained its position through acquisitions of patents.

In paragraph 59 of its complaint the Government alleged that Landis Machine Company (which has been engaged since 1906 in the manufacture and sale of shoe repair machinery), "agreed with United to refrain, and has refrained, from soliciting the business of shoe manufacturers for machinery manufactured by Landis." The evidence shows no such agreement, express or implied. No useful purpose would be served by reciting the parties' patent controversies, their exchange of non-exclusive licenses, Landis' sales to the shoe machinery trade, or other details, for even cumulatively, they do not show a tacit understanding to divide fields. In fact, Landis does sell shoe machinery to shoe factories. Its failure to sell more may be due to the market power of United, but it is not due to any consensual arrangement.

The other instances of "restrictive agreements", covered in the transcript, the briefs,

and the requests for findings, add nothing of significance to the case. Taken cumulatively, they do not show that restrictive agreements in the shoe machinery field have been important sources of United's power, have substantially affected competition, or have maintained to any noteworthy degree United's share of the market. They do, however, illustrate the degree to which the Government has unnecessarily increased the burden resting on the parties and the Court. Further reference to them would only serve to encourage the repetition in later antitrust litigation of the unforgivably unselective tactics pursued by the Government in this case.

H. Leasing (Including Written Provisions, Unwritten Practices, Service, Effects of These Provisions and Practices on United, its Lessees, and its Competitors, and United's Pricing Policy).

1. *Introduction.*

The practice of leasing shoe machinery began as early as the Civil War, was followed by the companies from which United was formed, and has been continuously used by United and most of its American competitors. Of the 342 machine types now marketed by United, United offers 178 on lease basis only, 42 on sale basis only, and 122 on alternate lease or sale terms at the customer's option. The more complicated machines, those producing the largest revenue, and those of more importance for the shoe manufacturer are offered only for lease.

A standard type of lease was annexed to defendant's answer as Exhibit F (pp. 333–345), and reads as follows:

This Agreement made this day of between the United Shoe Machinery Corporation, a corporation duly organized by law, hereinafter referred to as the United Corporation, of the one part, and of in the State of hereinafter referred to as the lessee, of the other part:

Witnesseth, that the United Corporation, in consideration of the covenants and agreements on the part of the lessee herein contained, does hereby lease to the lessee the machine or machines of the United Corporation now or hereafter delivered to the lessee and designated by number or numbers in the following schedule, viz.:—

Schedule of Machines

| | I. | II. | III. | IV. | V. | VI. | VII. |
|---|---|---|---|---|---|---|---|
| | Payment in case of loss by fire, etc. (See Article 3) | Initial payment (See Article 6) | Rental (See Article 7) | Payment per pair (See Article 8) | Monthly payment for use less than minimum (See Article 8) | Minimum number of pairs per month (See Article 8) | Payment upon expiration or termination (See Article 14) |
| USMC Wood Heel Attaching Machine, Nos. ........... | $200.00 | None | $1.25 | 1¢ | $6.00 | 2,500 | $75.00 |
| USMC Heel Seat Drilling Machine, Nos. ........... | 100.00 | None | 5.00 | None | None | None | 35.00 |
| USMC Heel Seat Fitting Machine, Model A, Nos.... | 675.00 | None | 1.50 | ⅜¢ | 6.00 | 4,000 | 150.00 |
| USMC Heel Seat Forming Machine, Model B, Nos.... | 650.00 | None | 2.75 | 1¢ | 12.00 | 4,000 | 200.00 |
| USMC Screw Remover, Model B, Nos. .......... | 75.00 | None | 3.00 | None | None | None | 25.00 |

and any duplicate parts, extras, mechanisms and devices relating thereto, or used in connection therewith, now attached to or delivered with the said designated machine or machines, or which may at any time hereafter be obtained from the United Corporation, or be added thereto by or with the consent of the United Corporation (the whole of which machine or machines, duplicate parts, extras, mechanisms and devices, held by the lessee under these presents, whether now or hereafter delivered to or in the possession of the lessee, is hereinafter referred to as the "leased machinery"), subject to the conditions hereinafter contained.

And that the following are agreed to as conditions of the lease hereby granted, all of which the lessee covenants and agrees to observe, keep and perform :—

**Property rights, etc.** 1. The leased machinery shall at all times remain and be the sole and exclusive property of the United Corporation, and the lessee shall have no right of property therein, but only the right to use the same, upon the conditions herein contained. The leased machinery shall be used only by the lessee himself or by operatives in his direct employ, and only in the factory now occupied by him at in the State of
The leased machinery shall not be transferred or delivered or sublet to any other person or corporation, and neither this agreement nor the lease hereby granted can be assigned by the lessee by his own act or by operation of law. The United Corporation and its agents and employees shall at all times have free access to the leased machinery for the purpose of inspecting it or watching its use and operation, or of altering, repairing, improving, or adding to it, or determining the nature or extent of its use, and the lessee shall afford all reasonable facilities therefor.

**Machinery to be kept in good condition; parts, etc.** 2. The lessee shall at all times and at his own expense keep the leased machinery in good and efficient working order and condition, and shall not permit any one to injure or deface or remove any plate, or dates, numbers, or other inscriptions now or hereafter impressed on or affixed to the leased machinery by the United Corporation. The lessee shall obtain from the United Corporation exclusively, and shall pay therefor at the regular prices from time to time established by the United Corporation, all duplicate parts, extras, mechanisms and devices, of every kind needed or used in operating, repairing, or renewing the leased machinery, and the same shall form part of the leased machinery, and the lessee shall not otherwise make or allow to be made any addition, subtraction or alteration to, from, or in the leased machinery without the consent in writing of the United Corporation, nor interfere with the proper operation of the same. In case at any time any of the leased machinery shall not, in the opinion of the United Corporation, be in good and efficient working order and condition, the United Corporation without prejudice to any other of its rights or remedies may give written notice to the lessee to put such machinery in good and efficient working order and condition and to replace all broken or missing parts; and in case the lessee does not within fifteen (15) days from the date of such notice comply with the requirements thereof, as herein set forth, the United Corporation may cause such machinery to be put in such good and efficient working order and condition, and may supply such broken or missing parts, and the lessee shall forthwith pay to the United Corporation the expense of making such repairs and the cost at the regular prices established by United Corporation therefor of all parts so supplied.

**Loss by fire, etc.** 3. The leased machinery at all times, until redelivered to the United Corporation as hereinafter provided, shall be held at the sole risk of the lessee from injury, loss, or destruction, and in case the same or any thereof shall be destroyed by fire or otherwise before such redelivery the lessee shall pay to the United Corporation in respect to each machine so destroyed the sum (if any) set opposite the name of such machine in column I in the foregoing Schedule of Machines as partial reimbursement to the United Corporation

for such destruction, and the lessee shall forthwith return whatever remains of the machinery so destroyed to the United Corporation at Beverly, Massachusetts.

**Taxes** 4. At all times until redelivery of the leased machinery to the United Corporation the lessee shall pay all taxes and assessments which shall be assessed upon or in respect to the leased machinery or any interest therein or the rights to payments hereunder, upon whomsoever the same may be assessed.

**Machine use** 5. The leased machinery shall be used for no other purposes than for performing the operations for which it is designed in the manufacture of boots, shoes or other footwear made by or for the lessee. Subject to the foregoing limitations, the lessee shall use

**Full capacity** the leased machinery to its full capacity upon all boots, shoes or other footwear or portions thereof made by or for the lessee in the manufacture or preparation of which such machinery is capable of being used, and the provision herein contained shall not be construed to be limited in any way by the number of pairs designated in column VI in the foregoing Schedule of Machines.

**Initial payment** 6. The lessee shall pay to the United Corporation immediately after the execution hereof, as an initial payment for each machine hereby leased, the amount (if any) set opposite the name of such machine in column II in the foregoing Schedule of Machines.

**Monthly rentals** 7. The lessee shall pay to the United Corporation as monthly rental in respect to each machine hereby leased the amount (if any) set opposite the name of such machine in column III in the foregoing Schedule of Machines. Such rental in respect to each calendar month shall be due and payable on the last day of the next ensuing calendar month.

**Unit charge** 8. The lessee for each machine hereby leased shall pay to the United Corporation in respect to each pair of boots, shoes or other footwear or portions thereof operated upon by such machine the amount (if any) set opposite the name of such machine in column IV in the foregoing Schedule of Machines, and in addition, for each calendar month in respect to each machine hereby leased such proportion (if any) of the amount set opposite the name of such machine in column V as the number by which the number of pairs operated upon by such machine in such calendar month falls short of the number of pairs set opposite the name of such machine in column VI bears to the number in column VI. Such payments in respect to each calendar month, and in respect to all operations performed in such calendar month, shall be due and payable on the last day of the next ensuing calendar month.

**Payments independent of other leases** 9. All payments in this agreement provided for are payments in respect to the specific machines hereby leased only and are independent of, and in addition to all payments provided for the use of machines held under any other leases or agreements between the United Corporation and the lessee. No payment made under any other agreement shall relieve the lessee from any payment hereunder, and no payment made hereunder shall be held to apply in whole or in part as payment in respect to other machines than those hereby leased, or to relieve the lessee from any payment under any other lease or agreement or for the use of any other machine or machines of the United Corporation.

**Indicators** 10. The United Corporation may attach to each machine hereby leased an indicator or indicators to register the number of revolutions or movements of any part or parts thereof, and the lessee shall not allow any person (other than the United Corporation or its agents) to disturb or interfere with such indicator or indicators. In case any indicator thus attached shall from any cause cease to correctly indicate or register, or shall be disturbed or out of repair, or if the glass covering any such indicator shall be removed or broken or injured, then and as often as the same shall happen the lessee shall immediately give written notice thereof to the United Corporation and at the

same time explain the circumstances under which the same has happened.

**Reports of use, etc.** 11. The lessee, independently of any indicators which may be attached to the leased machinery, shall keep full and accurate records of all work done by the aid of each machine hereby leased, and shall report all such work to the United Corporation in such detail as the United Corporation may request. The lessee, if so requested by the United Corporation, shall require each of his operators upon any machine hereby leased to keep upon blanks or blank books to be furnished by the United Corporation accurate daily records of the number of boots, shoes or other footwear or portions thereof in the manufacture or preparation of which he has used such machine, and shall require his operators to sign such records. The lessee shall send to the office of the United Corporation in Boston on or before the fifth day of each calendar month the original records for the next preceding calendar month kept by his operators as above provided for and in case in any calendar month any machine hereby leased has been entirely idle the lessee on or before the fifth day of the next succeeding calendar month shall send to the office of the United Corporation in Boston the blank for said month for such idle machine marked "Not in use" and signed by the lessee. The lessee shall also furnish in such form as may be called for by the United Corporation any further information requested by the United Corporation in relation to the leased machinery or the use thereof or to enable the United Corporation to determine the amount due it hereunder.'

**Term of lease** 12. The lease hereby granted in respect to each machine hereby leased shall continue, unless sooner terminated by the United Corporation because of breach thereof on the part of the lessee or otherwise as herein provided, for the period of ten years from the date hereof. The lease hereby granted or any extension thereof in respect to each machine shall however be subject to termination in accordance with the following provisions:—

**Termination for breach, insolvency, etc.** (A) In case any breach or default shall be made in the observance or performance of any one or more of the conditions herein contained, or if the lessee shall become insolvent, or if a sale, mortgage, lease or removal of the leased machinery, or any thereof, be made or attempted, or if any distress, execution or attachment be levied thereon, then and in each such case the United Corporation shall have the right, by notice in writing to the lessee, to terminate forthwith the lease hereby granted in respect to any or all machinery hereby leased, and this notwithstanding that previous breaches or defaults may have been unnoticed, waived or condoned by or on behalf of the United Corporation.

**Bankruptcy, etc.** (B) In case the lessee becomes bankrupt, or has a receiving order made against him, or makes or executes any bill of sale, deed of trust, or assignment for the benefit of creditors, the lease hereby granted in respect to all machinery hereby leased shall thereupon cease and determine unless the United Corporation shall upon notice thereof elect otherwise.

**Surplus machines** (C) In case the lessee, at any time, shall have in his factory more machines adapted for doing the same work as any machine or machines hereby leased than in the opinion of the United Corporation are sufficient for performing the work which the lessee has in his factory, based upon the capacity of such machines and the number and kind of boots, shoes, and other footwear made by the lessee for any period of twelve (12) consecutive months next preceding, the United Corporation may, at its option, upon thirty (30) days' notice in writing to the lessee, terminate the lease herein contained in respect to such of the said machines as in the opinion of the United Corporation are unnecessary.

**Extension of term** 13. If, upon the expiration of the full term of ten years above provided for, the lessee does not immediately return the leased machinery to the United Corporation and the United

Corporation does not request its return, then the leased machinery shall continue to be held and used under and in accordance with the conditions in this agreement contained and this agreement and the lease herein contained shall thereupon be extended indefinitely as to term, but thereafter either the lessee or the United Corporation upon sixty days' notice in writing to the other may terminate this agreement and the lease herein contained whereupon the lessee shall forthwith deliver the leased machinery to the United Corporation as herein provided.

**Return of machines** 14. Upon the termination in any manner whatever of the lease hereby granted or any extension thereof in respect to any machine hereby leased the lessee shall forthwith deliver such machine to the United Corporation, at Beverly, Massachusetts, complete and in good order and condition, reasonable wear and tear alone excepted, and shall pay to **Payment** the United Corporation in respect to each such machine the amount (if any) set opposite the name thereof in column VII in the foregoing Schedule of Machines. The lessee shall also pay to the United Corporation such sum as may be necessary to cover replacement at the regular prices established by the United Corporation therefor of all broken or missing parts.

**Right of entry** 15. Upon the termination in any manner of the lease hereby granted in respect to any machine or machines hereby leased the United Corporation by its agents is hereby authorized to enter upon any premises where such machinery or any thereof may be and to take possession of and to remove such machine or machines.

**Notice of termination, etc.** 16. Whenever any right of termination hereunder has accrued to the United Corporation a notice in writing, signed by the president, a vice-president, the treasurer or an assistant treasurer of the United Corporation or by any assignee of the United Corporation's rights hereunder, and posted by prepaid letter, addressed to the lessee or delivered at his usual or last known place of abode or business, that the lease hereby granted is terminated or shall be terminated at the expiration of a certain period, shall be a sufficient termination of the lease from the time of posting or delivering such notice, or from the expiration of the period therein mentioned, as the case may be. The termination in respect to any machine of the lease hereby granted shall not release the lessee from his obligation to make all payments for the period prior to such termination and shall be without prejudice to any other rights or remedies which the United Corporation may have for violation of contract, use of machines without right or otherwise.

**Change of terms** 17. None of the conditions or provisions of this agreement shall be held to have been waived by any act or knowledge of the United Corporation, its agents or employees, but only by an instrument in writing, signed by the president, a vice-president, the treasurer or an assistant treasurer of the United Corporation.

**Definitions, etc.** 18. The term "United Corporation" shall include the said United Shoe Machinery Corporation and its successors and assigns. All the conditions and provisions binding on the lessee shall be binding on and enforceable against his legal representatives. In the construction of this instrument, words relating to the number and gender of the parties shall be read according to their real number and gender.

**Prior leases superseded** 19. This lease agreement as to each machine hereby leased supersedes any and all prior leases or agreements heretofore made for such machine.

IN WITNESS WHEREOF, the parties hereto have duly executed this instrument in duplicate, the day and year first above written.

UNITED SHOE MACHINERY CORPORATION

By ..............................
Assistant Treasurer

..............................

By ......................
(Title)

If lessee is a corporation, add corporate seal here.

In the written terms of United's standard lease are 4 specific clauses which the Government alleged deterred competition. These related to (a) the period of time covered by the lease, that is, its term, (b) the requirement that a lessee of a unit charge machine should pay a monthly minimum charge, (c) the requirement that such lessee shall use his machine to its full capacity, and (d) the obligation of the lessee at the termination of the lease to make a deferred payment or return charge [Complaint, Par, 64].

In practice, these and other written provisions of the lease are in some respects modified; in some, supplemented. To show how the written provisions and unwritten practices are interwoven, the following findings consider in turn: the written provisions for the term of an original lease and for the term of a renewal lease; the written provisions for monthly minimum charges on unit charge machines; the written provision involving the full capacity clause; the written provision for deferred payments; the right of deduction fund, which is not referred to in the leases; the principal departures in practice from the foregoing four written provisions of the lease; other departures from those four, and certain other, written provisions of the lease; and the practice of supplying repair and other services not specifically covered in the lease.

Next, the findings examine the general effect upon United, its lessees, and competitors of the leasing system including both the written provisions and the unwritten practices. In that examination nothing is said of the impact of what may be called United's pricing policy, that is, the practices United has followed in determining what to charge for particular machine types. A separate section deals with the way these rates are set for individual machine types. And then the findings examine those instances where the Government claims that the rates set demonstrate that United was exercising monopoly power or was restraining actual or potential competition.

### 2. Term of the Lease.

Before 1922 the usual term of United's leases was 17 years. After the Sherman Act case, United offered the shoe manufacturers' representatives a 7 year term, but, to meet their preferences, United adopted a 10 year term, now in effect except for renewal leases. Renewal leases are for a 5 year term.

United's leases (and renewal leases) provide that upon the expiration of the 10 year term, (or the renewal term) the leased machinery shall continue under the lease indefinitely, but either party may, upon 60 days' notice, terminate the lease. United's policy has been not to leave the machine on 60 days' notice. If the lessee wishes to retain the machine, United executes a 5-year renewal lease.

The actual average lease life expectancy is, at the present time, 10 years. This is an average. A number of machines will be out on lease longer that 10 years; perhaps 30% will be out for as long as 15 years. Other machines will be out considerably less than 10 years, perhaps 20–25% will be returned in less than 5 years.

### 3. Monthly Minimum Charge, etc.

Generally speaking, no initial payments are required on machines leased only on a monthly rental or unit charge basis (though initial payments are required on most machines offered on optional lease or sale basis). That is, for lease only machines, no down payment is required, and no installation charge is made. However, when a new shoe manufacturing concern enters the business, United will supply its leased machinery only on condition that the manufacturer pay a deposit of varying amounts. For lease only machines, there are return charges, discussed below; usually monthly rental charges; and, for some types, monthly minimum charges. This last type of charge is discussed here. It is included in 91 types of machines, of which 6 are based on a unit charge only basis and 85, on a unit charge plus monthly rental basis.

Leases covering these 91 types contain a provision for a monthly payment (in addition to the monthly rent, if any is pay-

able), if the machine is used for less than a certain minimum number of pairs per month. The minimum for each machine type is not fixed according to a formula applicable to all machine types. United usually establishes the minimum number of pairs per month at approximately 25% of its estimate of the capacity of the machine type. It usually sets the monthly payment for less than that minimum use at 40% of what the minimum number of pairs charged at the unit rate would yield. Since 40% of 25% is 10%, this means that the minimum charge is usually 10% of what United would receive in unit charges if the machines were used to United's estimate of full capacity.

### 4. Full Capacity Clause.

United's leases contain a covenant by the lessee that he "shall use the leased machinery to its full capacity upon all * * * footwear * * * made by or for the lessee in the manufacture * * * of which such machinery is capable of being used."

### 5. Deferred Payment (Sometimes called Return Charge).

United's leases contain a provision for a payment upon the return of machines of all but 3 minor types. The amount of this deferred payment runs somewhere between 30% and 40% of the manufacturing plus the developmental cost of the machine type, but there is no fixed formula.

### 6. Right of Deduction Fund.

Effective January 1, 1923, United established an amortization plan, or right of deduction fund. This plan is not referred to in the text of the leases. It was established, and has been modified by, written notices to lessees. Under the plan, 2% (increased to 3% beginning February 1, 1927, and to 4% beginning August 1, 1939) of all unit charges, rentals and minimum charges, on a machine is credited to the lessee. The credit is solely for the purpose of being applied, if the lessee desires, to deferred (or return) payments and, since 1939, to payments "for use less than minimum", due on that machine or other machines in that factory. And the credit is not available if the lessee is in default on any payment due United, or if the lease has been terminated by reason of the lessee's breach or insolvency.

### 7. Principal Departures from Foregoing Lease Provisions.

Despite its express terms, the full capacity clause is not considered by United to have been violated unless the lessee fails to use the machine on work for which the machine is capable of being used, and instead performs such work by using a competitor's machine. In other words, it is not treated as a violation if the lessee fails to use United's machines because he performs the work by hand, or because he discontinues the type of operation for which the machine is capable of being used.

Despite the 10-year term of the lease, where a lessee wishes to return a leased machine because he has abandoned the operation, or intends to perform it by hand, or finds that the machine will not perform successfully the operation the lessee contemplates, or replaces it with another United machine, United always allows him to return the machine upon paying for transportation, broken and missing parts, and a return charge if there is any. However, where a lessee wishes to return a United machine solely to replace it with a competitor's machine, United allows the return, on the payment, in addition to the items just stated, of an adjustment or commutation of sums that would have accrued thereafter. That commutation charge was fixed by a plan which went into effect in 1935. Under the plan, a lessee returning a machine leased without any unit charges, has been charged, in addition to the items mentioned, 25% of the monthly rentals payable for the balance of the term plus the deferred payment; and a lessee returning a machine leased in whole or in part on the basis of unit charges, has been charged, in addition to the items mentioned, 50% of the minimum monthly payment for the balance of the term of the lease after the waiver of 4 months, for each of the remaining years, plus the deferred payment. These charges are, at the lessee's option, payable in cash or charged against the Right of Deduction Fund.

The Government offered 90 instances where United invoked the full capacity, return, or like provisions of the standard lease during the period 1927–1948, that is, both before and after the 1935 plan.

The more striking earlier instances include these examples. From 1931 to 1935 Florsheim wanted to return 5 United machines covered by unexpired leases, and substitute competitors' machines, but United insisted on the lease terms, including the full capacity clause. In 1931 Dunn & McCarthy, Inc. had a precisely parallel experience with 2 leased United machines. In 1932 United took at least initial steps to enforce the full capacity clause against Mishawaka Rubber & Woolen Mfg. Co. which had set aside United machines in favor of Mishawaka's own machines. In 1932 American Felt Slipper Co. wanted to return an Alpha Wood Heel Nailer, and United quoted a higher return charge in July when American planned to substitute a German machine, than United later quoted and accepted when such substitution was not involved.

The later instances show United's practices under its 1935 plan. Typical of United's post-1935 practice of billing its customers under the full capacity clause when competitive machines were used, and refunding the amounts by credits when those competitive machines were returned are: Unity Shoemakers, 1936; Barr and Bloomfield, 1936; and Shapiro Brothers, 1936–1937. In another comparable instance, Lucille Footwear in 1937 transferred a competitive machine to other production, after United invoked the full capacity clause.

The instances cited, and the 1935 plan on its face, show that United, in accepting returns of machines before the lease has terminated, offers less favorable terms to a lessee who wishes to replace United's machine with a machine of outside manufacture, than to a lessee having some other reason for returning a United machine. The discriminatory features of this plan and practice are not explicable merely on revenue grounds. The discrimination is designed to operate as, and does operate as, a method of excluding from the shoe factories shoe machinery competitive with United. If this were otherwise doubtful, this finding is confirmed by the statement in court of United's president "that the full capacity clause operates as a deterrent to a factory taking on a competitor's machine" and the General Manager's statement that "there is a deterrent to cover * * * the use of a competitive machine in place of the corporation's machine."

8. *Other Departures from Lease Provisions.*

United's practice is to furnish a machine temporarily and only for a limited period to take care of periods of peak production in a shoe factory. Before United makes a peak-load installation, it requires the lessee to sign a regular 10-year lease which automatically goes into effect if the machine is not returned within a specified period of time. If the peak-load machine is promptly returned, no deferred payment is charged.

Since at least 1924, United has allowed shoe manufacturers to obtain machines for a trial period of 30 days which may be extended for successive 30-day periods. Before a trial-period installation, United requires the lessee to sign a regular 10 year lease which automatically goes into effect if the machine is not returned within a specified period of time. For a trial machine which is seasonably returned the lessee pays the regularly established terms, except that he does not pay a deferred payment charge.

By management letters, United has waived monthly minimum charges during some portion of the year. Originally the period was two months; since 1926, the period has been any 4 months selected by the lessee, or, in default of selection, the 4 months most favorable to him.

United's leases provide that the leased machinery shall be insured. However, for the past 25 years this insurance clause has been waived by management letters. The reason for using the management letters was to allow United, if it saw fit in

the future, to change its general policy and to withdraw the waiver and enforce the insurance provision.

### 9. Service.

United's leases provide that the lessee shall at all times and at his own expense keep the leased machinery in good order; and that if in United's opinion the machinery is not in good order United may cause it to be so put, and the lessee shall pay United the expenses of making repairs and replacing parts. However, in fact, United has at all times assumed the burden of keeping its leased machinery in good order. It has made no separate charge to the lessee for such services, but has charged him for such parts as are required.

To keep in good order the leased machines, which in 1947 were distributed among 1,220 enterprises, and to render certain other services, United has a Department of Agencies which coordinates 16 branch offices and 29 sub-offices and service stations, located in 17 states. Each of the 16 branch offices has a manager, a sales manager, a machinery department manager, salesmen, clerks and roadmen. No branch office, except Los Angeles, has fewer than ten roadmen. The sub-offices have chiefly roadmen. In 1951 in all branch-offices and sub-offices there were 1500 employees, of which 828 were road-men.

The most important duty of roadmen is to respond quickly when a factory's United machine breaks down, and as soon as possible to get it in good condition. Calls for this service are frequent: in some factories 2 to 10 men are needed every day. Road-men carry parts in their bags. More extensive stocks are maintained in each of the branch offices, in Beverly, and in Boston. Roadmen are generally trained as experts on certain groups of machines. They not only repair, they also install new United machines and instruct operatives in their use. When asked, roadmen give expert advice on how to improve the quality of shoe production, give help in various technical shoemaking and shoe factory problems, and, in general, are available for all sorts of counsel and cooperation.

From Boston, United furnishes other services, if desired. The so-called Shoe Ex Department furnishes shoe making advice. The Planning Department is available to assist shoe manufacturers desiring engineering surveys on production methods, on costs, on factory layouts, and other matters.

In all respects, the service rendered by United is uniformly of excellent quality. It is promptly, efficiently, and courteously rendered. No system that has been suggested would be likely to be superior from a technological viewpoint. Shoe manufacturers, in general, are well satisfied with the technical service.

Nor have shoe manufacturers protested at the economic consequences of United's practice of setting monthly and unit charges high enough to pay United for service rendered, instead of following the practice of lowering monthly and unit charges and then charging separately for service as rendered. But, though no protest has been received, it is plain that the practice of tying into one bundle the use of the machine and services in connection with it, is a method which is to the advantage of some, and the disadvantage of other, lessees. From the sample study of the Milwaukee manufacturers, from the testimony of Assistant General Manager Walker, and from other evidence, it appears that some plants have persistently high service requirements and others have persistently low service requirements, and it is not true that over the years the cost to United of supplying service averages the same regardless of who is the lessee. The cost to United will be higher, for example, if the management is inexperienced or inefficient, if the plant has poor labor relations, if the type or quality of shoes made involves a high degree of repair, if the number of shoes of a particular style or size produced is less than average, or if the factory is so distant from a branch office as to require more than average travel.

In short, United gives varying amounts of service to customers who make the same payments. To a large extent, the customers who will make above-average demands are predictable. Since the variations in service

requirements are systematic and not random in character, the failure to charge for service on the basis of the amount rendered does not conform to sound insurance principles. To put the same matter another way, the efficient manufacturer, with good managerial and labor relations, located in the heart of a large shoe center, is not paying to avoid the risk that his concern will have an unpredictably large call for service, but is bearing to some extent the burden of the predictably large call for service of the distant, inefficient managements.

## 10. Effects of the Leasing System.

The effect of United's leasing system as it works in practice may be examined from the viewpoints of United, of the shoe manufacturers, and of competitors potential or actual.

For United these are the advantages. (a) United has enjoyed a greater stability of annual revenues than is customary among manufacturers of other capital goods. But this is not due exclusively to the practice of leasing as distinguished from selling. It is attributable to the effects of leasing when, as is the case with United, the lessor already has a predominant share of the market. (b) United has been able to conduct research activities more favorably than if it sold its machines outright. The leasing system, especially the service aspect of that system, has given United constant access to shoe manufacturers and their problems. This has promoted United's knowledge of their problems and has stimulated United's shoe machinery development. This research knowledge would not be diminished substantially if United's service activities covered fewer factories. But if all access to shoe factories were denied the diminution would be of great consequence to research. (c) The steadiness of revenues, attributable, as stated above, not to the leases alone, but to leases in a market dominated by the lessor, has tended to promote fairly steady appropriations to research. But these appropriations declined in the 1929 depression. Research expenditures might or might not be increased if competition were increased. The experience of United when faced with Compo's cement process suggests that declining revenues, no less than steady revenues, may promote research expenditures. (d) United has kept its leased machines in the best possible condition. (e) Under the leasing system United has enjoyed a wide distribution of machinery in a relatively narrow market. But this is merely another way of saying that United's market position, market power, lease provisions, and lease practices give it an advantage over competitors.

Upon shoe manufacturers, United's leasing system has had these effects. It has been easy for a person with modest capital and of something less than superior efficiency to become a shoe manufacturer. He can get machines without buying them; his machines are serviced without separate charges; he can conveniently exchange an older United model for a new United model; he can change from one process to another; and his costs of machinery per pair of shoes produced closely approximate the machinery costs of every other manufacturer using the same machinery to produce shoes by the same process. Largely as a consequence of these factors, there were in 1950, 1300 factories each having a daily production capacity of 3,000 pairs a day or less; 100 factories each having a capacity of 3,000 to 8,000 pairs; and 40 larger manufacturers. Many of these larger manufacturers, who collectively account for 40% of the shoe production of the United States, started in a small way and flourished under United's leasing system. Moreover the testimony in this case indicates virtually no shoe manufacturers who are dissatisfied with the present system. It cannot be said whether this absence of expressed dissatisfaction is due to lack of actual dissatisfaction, to practical men's preference for what they regard as a fair system, even if it should be monopolistic, or to fear, inertia, or reluctance to testify.

However, while United's system has made it easier to enter the shoe manufacturing industry than to enter many, perhaps most, other manufacturing industries, it

has not necessarily promoted in the shoe manufacturing field the goals of a competitive economy and an open society. Without attempting to make findings that are more precise than the evidence warrants, this much can be definitely stated. If United shoe machinery were available upon a sale basis, then—

· (a) Some shoe manufacturers would be able to secure credit whether by conditional sales, chattel mortgages, or other devices.

(b) Under such a system, there is no reason to suppose that a purchaser's first installment on a machine would significantly exceed the deposit now often required of a new shoe manufacturer by United.

(c) A few shoe manufacturers would be able to borrow at rates of interest comparable to the interest rates at which United borrows, or raises capital.

(d) Some shoe manufacturers would be able to provide for themselves service at a cost less than the average cost to United of supplying service to all lessees of its machines.

(e) Those manufacturers who bought United machines would not be subject, as are those manufacturers who lease United machines, to the unilateral decision of United whether or not to continue or modify those informal policies which are not written in the leases and to which United is not expressly committed for any specific future period. While there is no evidence that United plans any change in its informal policies, and while United has not heretofore proceeded to alter its informal policies on the basis of its approval or disapproval of individual manufacturers, United has not expressly committed itself to continue, for example, its 1935 plan for return of machines, its right of deduction fund, its waiver for 4 months of unit charges, or its present high standard of service. United's reserved power with respect to these matters gives it some greater degree of psychological, and some greater degree of economic control, than a seller of machinery would have.

(f) Some manufacturers who had bought machinery would find that financial and psychological considerations made them more willing than lessees would be, to dispose of already acquired United machines and to take on competitors' machines in their place.

In looking at United's leasing system from the viewpoint of potential and actual competition, it must be confessed at the outset, that any system of selling or leasing one company's machines will, of course, impede to some extent the distribution of another company's machines. If a shoe manufacturer has already acquired one company's machinery either by outright purchase, by conditional purchase, or on lease on any terms whatsoever, the existence of that machine in the factory is a possible impediment to the marketing of a competitive machine.

Yet as already noted, a shoe manufacturer may psychologically or economically be more impeded by a leasing than by a selling system. And this general observation is buttressed by a study of features in the United leasing system which have a special deterrent effect. Though these features are stated separately, and some of them alone are important impediments, they must be appraised collectively to appreciate the full deterrent effect.

(a) The 10 year term is a long commitment.

(b) A shoe manufacturer who already has a United leased machine which can perform all the available work of a particular type may be reluctant to experiment with a competitive machine to the extent he would wish. He may hesitate to ask for permission to avoid the full capacity clause. If permission is given for an experimental period he may find the experimental period too short. Thus a competitor may not get a chance to have his machine adequately tried out by a shoe manufacturer. If a shoe manufacturer prefers a competitive machine to a United machine on hand, he may not know the exact rate at which future payments may be commuted. If he knows, he may find that a fresh outlay to make those commuted payments (which admittedly are not solely for revenue but also are for protection against competition, and which admittedly discriminate in favor of

a lessee who takes a new United machine and not a competitor's machine) plus the rentals he has already paid cost him more than if he had bought a similar machine in the first place and were now to dispose of it in trade or in a second-hand market. Thus for a maker of competitive machines he may be a less likely customer than if United had initially allowed him to buy the machine.

(c) United's lease system makes impossible a second-hand market in its own machines. This has two effects. It prevents United from suffering that kind of competition which a second-hand market offers. Also it prevents competitors from acquiring United machines with a view to copying such parts of the machines as are not patented, and with a view to experimenting with improvements without disclosing them to United.

(d) United's practice of rendering repair service only on its own machines and without separate charge has brought about a situation in which there are almost no large scale independent repair companies. Hence when a typical small shoe manufacturer is considering whether to acquire a complicated shoe machine, he must look to the manufacturer of that machine for repair service. And a competitor of United could not readily market such a complicated machine unless in addition to offering the machine he was prepared to supply service. As the experience of foreign manufacturers indicates, this has proved to be a serious stumbling block to those who have sought to compete with United.

(e) If a shoe manufacturer is deciding whether to introduce competitive machines, (either for new operations or as replacements for United machines on which the lease has not expired), he faces the effect of those decisions upon his credit under the Right of Deduction Fund. If he already has virtually all United machines, and if he replaces few of them by competitive machines, the Fund will take care of substantially all his so-called deferred charges, and may cover some of his minimum payments. This is because credit to the Fund earned by a particular machine enures to the benefit of all leased machines in the factory, and the maximum advantage to the shoe manufacturer is to have a large number of United machines to which the credit can be applied. This advantage to the shoe manufacturer of acquiring and keeping a full line of United machines deters, though probably only mildly, the opportunities of a competing shoe manufacturer.

11. *United's Pricing Policy for Shoe Machinery.*

In setting sale and lease terms for machines, United has followed the policy of securing from its shoe machinery business as a whole sufficient income to pay the expenses of that business and accompanying services and research, and to return a profit. In setting terms for individual machine types, it has taken into account the benefit which the machine is expected to give the shoe manufacturer, the prices charged by competitors, uniformity of rate for all customers, and steadiness of rates throughout the years. There is little or no evidence that United has fixed its prices on the basis of its patent strength in connection with each machine type. But there is, as appears later in this findings, considerable evidence, that United has fixed its prices in order to minimize competition.

There is no evidence that United has secured a monopoly profit on its total operations, or on the machinery branch as a whole. United's book earnings on its total operations 1925–1949 were about 10% net, after taxes, on invested capital. This approximates the average of 72 other manufacturers of durable equipment.

In attempting to calculate profits earned by individual types of machines produced by a multi-product firm, there is always some arbitrary element in the allocation of overhead, research, and the like. Any attempt rigidly to apply a particular formula would not be practical. United has used its so-called "10 year investment formula" as a rough guide, but not as an absolute standard, in determining costs, fixing prices, and estimating the profitableness of lease-only machines.

Under the formula, four items are added: (1) the amount spent on the development of that particular machine type rateably distributed among the machines of that type United expects to market; (2) the estimated manufacturing and installation costs for each machine; (3) 60 per cent of item 2; and (4) the estimated annual cost of services multiplied by 10 and then multiplied by .27.

Without elaborate analysis, it readily appears that this formula is crude. For example, the calculation ignores the time distribution of research and manufacturing expense, and also of actual machine leasings. For this and other reasons, there is no reality to the 60 per cent item which purports to represent interest. The manufacturing and installation costs are computed without regard to fluctuating prices of materials, and with arbitrary inclusions of round percentages for assembly of parts and for overhead. Service costs are hardly better than informed guesses.

Despite this crudity, the 10 year investment formula for calculating costs can reasonably be used to determine in a general way whether there are wide variations in margins between costs and prices among United's various machine types; and, if so, where the margins are greatest and least.

On this point S–310 speaks conclusively. It shows the variations in the number of years required to return the 10 year investment on the basis of the 1950 terms applied to 66 machine types. One machine returns the 10 year investment within 2 years; 29 more within 4.5 years; 13 more within 5.5 years; 19 more within 8 years; 2 more within 10 years; 1 more within 11 years; and 1 more within 12.1 years. Since the smaller the number of years it takes to return the 10 year investment cost, the higher the margin of profit, this exhibit reveals one aspect of the range of· "price discrimination", in the economic sense.

Another aspect of price discrimination is revealed by this and other exhibits. The 10 year investment will be returned under the 1950 rates in 2.21 years in the case of the Welt Sewing K; 3.9 years, Inseam Sewing B; 4.36 years, Sole Laying A; 4.66 years, Outsole Rapid Lockstitch O; 5.3 years, Sole Stitching C; and 6.0 years, Cement Sole Attaching B. The machine types just listed are in an ascending order from the point of view of outside competition: there is virtually no machine that competes with defendant's Welt Sewing K; while at the other end of the scale there is the vigorous competition of Compo.

Further insight into United's price discrimination comes from analyzing nine instances of United's pricing policy which were selected as samples by the Court from the Government's offer of evidence.

1. The Heel Seat Fitting Machine, Model A was brought out by United in 1931, with a unit charge of ⅜¢ per pair. The original unit charge was lower than that on defendant's Heel Seat Fitting (Henne) Machine, Model B, which it replaced and which had cost less to manufacture. When terms were first set on Model A, that model faced competition from heel seat fitting machines manufactured by three different companies, each of which set terms lower than United. Four years later, in 1935, United reduced the unit charge to ¼¢ per pair. One of the reasons for that reduction was to match the unit rate on one of the competing machine types which was about to be acquired by Compo; though another reason was that defendant's Model A had already exceeded by 121 per cent its anticipated market. In the year before the reduction, defendant derived from Model A as average earnings per machine $323.19. In 1936 the average dropped to $278; but in the next 5 years it never went below $221. United's outstanding Model A's increased from 221 in 1934 to 514 in 1939; whereas Compo reached a high of 34 in 1937; and dropped to 22 in 1941. In 1946, in order to increase revenue, United restored the rate to ⅜¢.

The foregoing instance does *not* show that United marketed a machine below cost. It does show that in the face of existing competition, United offered in place of an old model, a more expensive new model but at lower rates. It also shows that in the face of anticipated vigor-

ous competition by Compo, United reduced its terms on that new model, and such reduction helped United to expand its market for heel seat fastening machines and to keep Compo from capturing any large part of that market.

2. In 1930 the Xpedite Finishing Machine, Model D was brought out by United with a unit charge of ½2¢ per pair. On this basis it was expected to return the 10 year investment in a little over 5 years. When in 1936 Sheehan & Egan put out a competing machine on alternative sale or rental basis, United brought out Xpedite Finishing Machine, Model E on a $6 monthly rental basis. On this basis it was expected to return the 10 year investment in 8.2 years. The monthly rate on Model E was for many shoe manufacturers lower than the unit rate on Model D, and (since service was included with United's models) was for many shoe manufacturers more attractive than the terms on which the Sheehan & Egan machine was put out.

The foregoing instance shows that United, in order to maintain its market for finishing machines and in order to avoid losing part of it to a competitor, brought out in 1936 a new model at rates that gave United a sharply lower rate of return than did the earlier model—though not at rates so low that United failed to recoup its combined out-of-pocket and development expense.

3. Previous to 1933 United offered (1) a Wood Heel Nailing Machine, with a unit charge of ⅜¢ per pair, and (2) the Alpha Wood Heel Nailing Machine, with a unit charge of ¼¢ per pair. These machines would attach not only low Cuban heels, but also the high heels known as "Louis heels". About 1932 slipper factories in New York began buying 2 types of wood heeling machines manufactured in Germany. United in 1933 brought out the USMC Wood Heel Nailing Machine, Model B, with a unit charge of ⅛¢ per pair, and a minimum number of 20,000 pairs per month. These terms were published for the use of the Boston office only. The effect of these minima was to make the German machine attractive only to such

slipper manufacturers as produced more than 23,600 pairs per month. Moreover, the Model B machine would not satisfactorily attach a Louis heel, and so was practically confined to the slipper trade, where the German competition had appeared. United in 1934 reduced the minimum number of pairs to 10,000 per month. In 1950 it raised the unit charge from ⅛¢ to ¼¢ per pair.

The foregoing instance shows that in order to meet competition, United brought out in 1933 a new model wood heeling machine for the slipper trade at a sharply lower rate of return—though, so far as appears, not at rates so low as not to recoup expenses. Moreover, here United's specific purpose to affect competition is shown by the fact that in designing the machine and its terms, United effectively limited the Model B to the slipper trade where there was competition, and United did not try to market the model among all shoe manufacturers.

4. The USMC Heel Seat and Wood Heel Drilling Machine, Model A, was brought out by United in 1937 at a $2 monthly rental charge, which was estimated, on the basis of a predicted field of 30 machines, to return the 10 year investment formula in 10 years. This machine type faced competition from 7 different home-made devices. 24 of these machines were shipped, of which 23 were returned. United did not recoup its out-of-pocket and developmental expenses.

The foregoing instance shows United marketed its Heel Seat and Wood Heel Drilling Machine, Model A at a loss. But this loss was not foreseen. Thus the instance shows only that to meet competition of home-made machines, United set a rate which it expected would return a very low rate of profit, but which in fact showed an out-of-pocket loss. Moreover, it should be added that the machine is of no great technological significance, is inexpensive, and has involved at most a couple of thousand dollars' loss. It is thus, in isolation, an unimpressive case.

5. The USMC Cement Sole Attaching Machine, Model A was brought out in 1929

by United, with a unit charge of 1¢ per pair. This was United's first cement sole attaching machine, and it was put out to meet Compo's competition at the same terms as Compo's comparable machine. United in establishing terms, ignored all developmental expense and service costs. It set terms which, if the anticipated field had been realized, would return the manufacturing expense. But the field was not realized, and United never recovered its manufacturing expense.

This instance shows that United, to meet competition, put out the USMC Cement Sole Attaching Machine, Model A at a rate too low to return its developmental, manufacturing, and service expenses. But there is nothing to show that when United incurred its developmental costs, it knew that it would never recover them in connection with this or some subsequent machine types. Once the developmental expense had been incurred, United was warranted in not trying to allocate it or a part of it to the first machine type suitable for the cement process. From a business point of view, United having already paid for research, was warranted in marketing the Model A on a basis that would return manufacturing cost, service cost, and a profit. And when it put out the Model A, United expected to recover (though it did not in fact recover) its manufacturing costs and probably something more.

6. The USMC Cement Sole Attaching Machine, Model B was brought out in 1932, with a unit charge of 1¢, reduced in 1935 to 3/4¢ a pair. There are no precise figures as to whether this machine was originally profitable. But after 1950 terms went into effect, this Model B was expected to return in 6 years the 10 year investment, leaving out developmental and research costs, which had perhaps by then been largely amortized.

This instance shows United setting prices in 1932 to meet Compo's competition, and for the same reason reducing them in 1935.

7. The Wood Heel Attaching Machine, Model A was brought out by United in 1922, with a unit charge of 1¢ per pair. In 1930, after the estimated field had been exceeded, the unit charge was reduced to 3/4¢. After

United's Heeling and Metallic Department had in 1932 reported competition, the rate was reduced in 1933 to 1/2¢. In 1935 Compo put out the Compo Wood Heel Attaching Machine at 1/4¢ royalty. November 15, 1935 United reduced its royalty to 1/4¢. Compo Wood Heel Attaching machines outstanding were 82 in 1936; 54 in 1937; 48 in 1938; 6 in 1945. United Wood Heel Attaching Machines, Model A, outstanding were 468 in 1936; 472 in 1937; and 545 in 1938. November 1946 United increased the unit charge to 3/8¢.

This instance shows United reducing a royalty rate to meet a competitor's royalty rate, and restoring the rate after the competition had virtually ceased. The failure of Compo to maintain its competition was not because its rates were undercut, because United never went below Compo's rates.

8. The USMC Perforating Machine, Model A was brought out by United in 1926. The terms were optional: a sale price of $350, or a lease at a monthly rental of $4 with a deferred charge of $44 and an initial payment of $87.50. United faced competition from a Peerless machine which sold for $235 (with a solid pulley) or $250 (with a pin clutch), and also competition from gang machines. In the face of this competition, United, while raising the rates on some other machine types it sold, did not raise the rates on Model A until 1939; though, both before and since 1939, United's sale price has always been higher than Peerless's sale price, and United's machine always sold for more than its manufacturing cost plus developmental expense.

This instance shows that, when it raised some other prices, United did not raise prices on the USMC Perforating Machine, Model A, because that machine faced competition from gang dies which had kept United from reaching the estimated field of 2000 for that machine.

9. The Moccasin Seam Attachment for the Goodyear Outsole Rapid Lockstitch Machine, Model O was supplied by United after 1930, and the unit charge for the machine when used with the attachment was set initially at 25¢ per 1000 stitches. Competition for this moccasin seam proc-

ess came from the Union Lockstitch machine which was sold new and second-hand. To meet that competition, United in 1933 reduced its rate from 25¢ to 15¢. United's average monthly returns per attachment were $14.11 in 1932, $12.45 in 1933, $11.99 in 1934, $21.94 in 1935, $22.65 in 1936, $23.95 in 1938, $20.77 in 1939. At the same time, competition from both Union Lockstitch and Singer increased. Again to meet competition, United in 1940 reduced its rate from 15¢ to 4½¢. United's average monthly returns per attachment were $20.-77 in 1939, $21.83 in 1940, $21.83 in 1941, $28.54 in 1942. There was some decrease in competition.

The foregoing instance shows that in the face of competition United reduced its rates. The lower rates brought United increased earnings, and also ultimately, though not until 1940, decreased competition.

The nine instances just set forth are representative of the more than 50 instances offered by the Government to show the pricing policies followed by United in leasing machines in the face of competition.

None of these instances—and no other called to the Court's attention—shows that United ever set lease terms with the knowledge or expectation that they would fail to return to United its out-of-pocket expenses for manufacture and service. It is true that in the cases of Instance 4, Heel Seat and Wood Heel Drilling Machine, Model A and Instance 5, Cement Sole Attaching Machine, Model A, the expectation was disappointed. But this failure to recover incremental costs was due to errors in prophecy, not to intent to incur out-of-pocket losses. The cases of the USMC Cement Sole Attaching Machine, Model A and Model B, (Instances 5 and 6) are perhaps the Government's strongest instances. They show that United failed to recover all or any specific fraction of the cost of developing those machine types used in the new cement attaching process. No doubt it was legitimate to spend something on research in connection with a new process, if that expense could be recovered within a reasonable time through the development of

several machine types. But here expense was incurred without much regard to its ultimate recovery, or indeed to anything but the need of meeting competition.

These nine representative instances conclusively show that in the face of competition, and with the purpose of meeting or defeating that competition, and retaining or expanding its own share of the market, United follows the policy of reducing its own rates (Instance 6, Cement Sole Attaching Machine, Model B; Instance 7, Wood Heel Attaching Machine, Model A; Instance 9, Moccasin Seam Attachment for Goodyear Outsole Rapid Lockstitch Machine), or introducing new models at lower rates than comparable older models (Instance 1, Heel Seat Fitting Machine, Model A; Instance 2, Xpedite Finishing Machine, Model E; Instance 3, Wood Heel Nailing Machine, Model B), or maintaining rates on a particular machine type despite a policy of increasing rates on other machine types to meet increased material and labor costs (Instance 8, Perforating Machine, Model A), or even of introducing a new model so designed and priced that it will reach only that area of the shoe manufacturing industry which is being assailed by a competitor (Instance 3, Wood Heel Nailing Machine, Model B).

### I. Research.

Many thousands of pages of testimony and many hundreds of proposed findings of fact covering United's research activities have been submitted to the Court. The principal legal issues to which this material has been addressed are these. The Government complains that "United has continuously sought to anticipate all demands of the shoe industry for improved or new machinery and, where such demand appeared to invite competition, to forestall such competition by manufacturing and distributing such machinery" [Par. 66], and "In all instances where new or improved machinery of importance has been introduced by competitors of United, United has developed and introduced similar machinery of its own for the purpose of displacing from shoe factories such machinery of its competitors and preventing its in-

stallation" [Par. 67]. Defendant, in addition to seeking to meet these issues, tendered its contention that it is entitled to avoid judgment against it, because its success is largely attributable to the superior quality and social value of its research, and because of the improbability that research of that quality and value could be achieved except by an enterprise having United's scope, market power, resources, leasing pattern, and other business practices. Moreover, defendant submits that even if its research does not enable it to avoid liability, a decree ought to be so framed as to give special consideration to preserving United's research activities.

The following paragraphs consider *seriatim*, a general description of United's research activities; attempts to measure the rate at which United improves old machine types, and the rate at which United introduces new machine types; and the contention that for competitive reasons United has shelved or delayed research at some times, and unduly accelerated it at others.

From the time of its incorporation, United has emphasized organized research and development. It has had for many years one of the principal industrial laboratories of the country. Thus in the year ending February 28, 1950 it had 572 persons engaged in research, and it expended roughly $4.3 million for research. Research activities cover shoes, shoe making and manufacturing, materials, shoe parts and components, manufacturing processes and operations, machines, manufacturing aids, materials, and supplies.

More than a third of the Research Division's present employees are college graduates. They come to United as scientifically trained men who expect to be taught by United shoe manufacture and shoe machinery. Many of the researchers become specialists in such subjects as welt work, stitching machines, cement and sole lasting, or slip-lasting.

United has, predominantly, trained its own inventive talent. While it has drawn to its employ some men already competent as shoe machinery inventors, virtually none of them has come in the last 15 years, and those that came earlier were usually employed in connection with the acquisitions of patents, heretofore considered. Those inventors who have been hired from outside, like those suggestions for inventions which have come from outside, have been attracted not through some covert process but by the fact that United's size, importance, and resources inevitably have large drawing power.

Before commenting in particular upon United's research in shoe machinery, it should be stated that, in general, United has a research organization of efficiency, intelligence, and vision. This was evident from the conduct of the witnesses on the stand. It is demonstrated by the company's fundamental research, which reaches into every aspect of the business, and by the company's interest in every branch of science and every modern scientific device which could be brought to bear upon the problems of shoemaking. It is indicated by the effectiveness with which United has performed engineering and other tasks for the Government in fields where United was being fairly measured against competitors, and where the results clearly demonstrated United's excellence. Finally, the Court was impressed by, and accepts, the highly favorable judgment of United's war time research expressed by Mr. Rowe, the fully qualified, disinterested and able engineer, who, as head of Section 12 of the Office of Scientific Research and Development, had unusual opportunity to learn of the relative capacity and performance of the research department of United, other industrial firms, and university laboratories. He regarded United in its war work as having no equal in technical ability and speed in the field of machine development, involving the control and coordination of complex motions in small spaces and similar problems.

Yet it is doubtful whether United's performance in the shoe machinery field itself, even in the light of the difficulties of that field is as extraordinary as defendant suggests.

It may be conceded that it is difficult to design shoe machinery because shoemaking

is an art dealing with variable materials on what are close to handicraft principles, rather than a scientific technique operating on standardized materials in mechanically repetitive fashion. The variables, already referred to in these findings, include a variety of styles, lasts, constructions, and sizes of shoes. These variables are enhanced by the practice of shoe factories of having short production runs. An even more fundamental variable is the principal raw material, leather, which varies from piece to piece, and almost from moment to moment. Moreover, the space curves presented by last and shoe surfaces necessitate in many complex machines motions in more than one plane or a pair of perpendicular planes.

Furthermore, it may be conceded that the conditions just described mean that, for a machine of major importance, an extended period of time, and large expenditures, are required for design, trial, and development to the point where the shoe manufacturing industry will accept it.

Yet with due allowance for all these difficulties, the rate at which United has improved old machine types and has introduced new machine types does not create a formidable record.

To be sure, the rate at which United has improved its outstanding commercial types is not accurately indicated by the use of a new model designation. For a new designation is given only when a change involves a new head casting. Yet it cannot be said to be entirely without significance that the median age of currently commercial models is 28 years, and the important machine types (in terms of revenue) are even older.

A better guide to the rate at which old models are changed is furnished by blue bulletins—a series of documents from the Research Division each of which covers a separate change in a particular machine type. A study of the 18 machine types which produce the largest revenue shows that, on the average, they have had 10 blue bulletin changes a year, of which only one every two and a half years reached the level of patentability in this industry. Among the more important of these 18

types, the largest number of average annual improvements have been on The Heel Seat Lasting Machine, Model D, the Cement Sole Attaching Machine Models A and B, and the Clicking Machine Model C; and the smallest number have been on the Welt Sewing Machine Model K. The less important revenue machine types have about half as many bulletin changes, and less than half as many patentable changes as these 18.

On the whole, the rate of improvement of old machine types does not justify special encomia.

With respect to its success in introducing entirely new machine types, United offered a wealth of testimony which is difficult to summarize. United expended vast sums and effort of high quality in trying to build a fully automatic line of machinery. Though it did not reach its goal, United did, as a by-product, develop and market various new machine types that were more automatic. Some of these are among the most complex machines now made for industry as a whole. And yet there are some reasons to doubt whether United's performance has been quite so good as it claims. United does not show that in its field in the last 30 or 40 years it has been responsible for more labor saving than has been achieved in other American industries. Moreover, United is responsible for only 4 of what Compo's research director regarded as the 6 most important developments in the shoe machine industry in the last quarter century. Its record is not noticeably superior where it competes with Compo Shoe Machinery Company (which has a smaller staff and budget for comparable work), but this admittedly is not the field where the most complicated machines are used.

In short, United has not proved as a fact that its research in the shoe machinery field and in allied developments is either the basic cause of its success, nor far beyond what could be achieved in a market structure where no monopoly existed.

However, the Government has also failed to prove that United has used its research activities as an improper competitive weapon.

United has not proceeded in a dilatory manner in commercializing advanced pulling over, welt sewing, and outsole stitching machines. In fact, United has expended large sums, and the delays have been due to necessary changes and trials and perhaps a prudent determination not to concentrate too intensely on machine types which can be matured more effectively at a less intense rate of speed.

United has not suppressed or delayed the introduction of machinery for the automatic performance of the peripheral operations in Goodyear welt shoe manufacture. In fact, this line of machinery proved impractical though much money was spent. Some important by-products did, however, result.

United was not unreasonable in failing to introduce into the American market the British Goodyear Outsole Stitching type, the Goodyear Inseam Sewing Machine Model B, and the Goodyear Outsole Stitching Machine Model A. In fact, these machine types as constructed were not entirely suitable for the high production American shoe manufacturers, and were not demanded by them, though their existence was known. Such aspects of those types as were useful were incorporated in American models.

United has not taken an unduly long time to reach end results. It has not deliberately slowed down or withheld developments until competition appeared, or until the demand for its own earlier models abated. It has not shelved developments.

However, there is support in the evidence for the Government's contention that United moved quickly in the face of competition to commercialize the Cement Sole Attaching Machine, Platform Cover Lasting Machine, the Heel Seat Laster Model E, and the Lacing Machine, Model A. But such speed as was displayed does not show any predatory motive.

Moreover, it is of crucial importance to note that the allocation of defendant's research expenditures has not uniformly tended to favor those areas where United had a relatively small or dwindling share of the market. On the contrary, research expenditures in the machine field have been divided not in proportion to competition, but roughly in the same proportion as revenues from the departments in which the machines would be used. Thus, taken as a whole, United's research activities do not reveal an exclusionary purpose.

J. Policing of Competition.

In Paragraph 72 of its complaint the Government alleges that United has employed its roadmen to police and report all installations of competitive shoe machinery in the United States. Earlier findings have shown what the functions of roadmen are and how they report on OMR's. Their activities show that United is far more concerned with watching competition than are most manufacturers. But there is no evidence that in the last decade customers have been disturbed by this constant reporting of their installations. The surveillance is chiefly significant insofar as it shows the degree to which defendant is concerned with competition.

K. Patents.

Paragraphs 73 through 82 of the complaint are under the heading "Engrossing shoe machinery patents and inventions to suppress competition." The relevant facts can be fairly summarized in a few paragraphs.

At December 15, 1947 United and its affiliates had 3915 patents. Over 2000 were in the shoe machinery category. The others were in the fields of methods, devices, lasts, etc.; boots, shoes, and leggings; and miscellaneous.

Roughly, 95% of these patents were the result of United's own research. It has been customary for those in the shoe machinery field to patent every novel detail. Moreover, when the Government has had work done in this field it has insisted on having patents procured to cover new developments. As a result, shoe machinery is a crowded art. In seeking patents on its own developments United has been motivated by the usual considerations of protecting its investment and securing the benefits of the patent laws.

About 5% of United's patents were acquired. United contends that the patents acquired by United have been generally to enable it to pursue development which might otherwise have been blocked, or to resolve patent controversies, or for hedging purposes. But most of these purposes could have been served by non-exclusive licenses. Taking the further step of acquiring the patents has (as has already been noted in connection with the preceding sections on "Acquisitions" and "Restrictive Agreements") buttressed United's market power. In some instances, such as the Little, Henne and Preo, and Beacon Folding Machine Co. transactions, the acquisitions made it less likely that United would have competition.

United has not acquired from others commercially practicable inventions of which it has failed to make commercial use.

The evidence does not permit of specific findings as to the technical scope, the legal strength, or the commercial value of the individual patents. It is, however, plain that most of the patents on the fundamental inventions have expired, and that most existing patents do not technically prevent the accomplishment of the same result in another way. Thus, it is clear that United's present dominance does not rest primarily on patents.

United has commercially used at least one-third of the patents it owns in each category. When there are taken into account the readiness with which patents in this field are sought, the specific experiences of Compo as a competitor, and the general experience of other large corporations, there is nothing unusually low in the percentage of commercial use. There is no reliable evidence that any of the patents not used by United are held back for improper purposes of any kind, or solely as preparation to attack a competitor if he should appear.

United has not refused any reasonable offers for licenses made by others. But other shoe machinery companies have not made such offers; and United has never offered to license all, or its principal, shoe machinery patents. On the basis of defendant's own expert testimony, however, it seems that if all of defendant's patents were formally offered by defendant on reasonable terms there would be some acceptances by shoe machinery manufacturers.

Defendant does not incorporate patent markings in its products. To do so would probably be impractical because a patent usually relates not to a machine but to some feature of it. Markings would not materially aid a copyist. The omission has not the purpose or effect of placing obstacles in the way of other shoe machinery manufacturers.

In serving formal or informal notices of infringements, or in instituting litigation for infringement of its patents, covering shoe machinery, United has proceeded in good faith. In cases such as those brought against Hamlin Machine Co., Gordon, and Freeman, United relied on the interpretation of the patent laws and on sound advice pursuant thereto given by counsel standing at the head of their profession. The fact that United in the end lost a suit does not necessarily show that United was not justified in suing. Neither the notices nor the suits constituted harassment of competitors. Whatever effect there has been on competition is the consequence of the exercise of privileges conferred by the patent law.

The evidence does not show that United has ever deliberately and in bad faith infringed patents owned by others. In the matters specifically called to the Court's attention such as those involving Hamlin Machine Co., International Shoe Machinery Corporation, and the Peerless Machine Co., United reasonably believed its conduct was not precluded by the patents held by others. This belief was fortified by advice from eminent counsel. The fact that ultimately a court decided United had infringed, does not by itself prove that United had deliberately engaged in a course of conduct it recognized was wrong, but might nonetheless be profitable.

L. Second-Hand Shoe Machinery.

During eleven years ending in 1942 United spent $350,392.24 for second-hand machinery mostly of its own manufacture.

Since 1942 there have been only minor purchases. So far as appears when machines were purchased in the second-hand market United did not use them as machines or re-sell them. It is a fair inference that United's purpose in acquiring them was to curtail competition from second-hand shoe machinery.

### M. Shoe Machinery Parts.

United's leases provide that the lessee shall obtain exclusively from United all duplicate parts. But in practice United does not enforce this provision in respect of standardized or expendable parts. Neither the provision nor the practice has been shown to interfere substantially with actual or potential competition, or to add anything of significance to the market power already attributed to the leasing provisions and practices heretofore discussed.

### N. Shoe Factory Supplies.

In paragraphs 90 through 94 of its complaint the Government alleges that "United has been engaged in a program designed to enable it to provide all shoe factories in the United States with all shoe factory supplies required by them." The Government then charges United with acquiring stock in supply companies, making distributing arrangements with manufacturers of shoe supplies, using various tactics to induce shoe manufacturers to use United shoe supplies, monopolizing eyelets and fastening materials used by lessees of United's eyeletting and metallic fastening machines, and establishing itself as the only distributor of a full line of shoe factory supplies.

The findings consider in turn the list of supplies offered by United, the unity and disunity of the market, the 14 supplies producing the largest gross income for United, United's acquisitions of supply businesses, United's share of the market in certain supply fields, reasons why United has achieved in some of these fields a high share of the market, B. B. Chemical Company's role, facts respecting economy of scale, United's distributorships, and United's miscellaneous tactics in the supply fields.

Supplies sold by United and its affiliates to the shoe industry fall into four broad classes:

(a) *Expendable parts of machines:* for example, cutters and irons, machine knives, needles and awls, brushes, machine awls and drivers, rolls and wheels, sharpening stones and wheels, abrasives, and finishing roll covers.

(b) *Materials that are driven, set, or applied to the shoe during the process of manufacture by the machines:* for example, nails and tacks, eyelets and hooks, wire, lacing thread, fibre fastening, waxes, adhesives, and insole reinforcing.

(c) *Materials and shoe parts that are not driven, set, or applied by machine:* for example, tapes, wood heels, shanks, box toes, liquids (finishes etc.), and shoe laces.

(d) *Accessories and convenience items:* for example, equipment (racks, carriers, etc.), shoe forms, hand tools and knives, cutting blocks and boards, shoe boxes, lasts, dies (cutting), paper, marking ink, and belting.

The foregoing and other shoe factory supplies comprise a wide range of items of different types. Unlike shoe machines, they are not so bound together by technical production relations, or by substitution and complementarity in use, as to constitute one market. Nor is a single aggregate market of shoe supplies created by the mere fact that United is a seller of a large line of supplies and shoe factories are buyers of those supplies. For United plainly has not tried to offer all or virtually all types of supplies: for example, it does not offer bottom filling, counters, or leather; and it has stayed out of other supply fields, despite offers to enter. So, while its line is long, it is not inclusive. In short, what this case presents is a series of supply markets. Many of them have some relations to one another. Most of them have a close relation to the shoe machinery market.

Viewed in terms of sales volume for the fiscal year ending February 28, 1948, the 14 most important supplies were:

1. Shoes boxes, $3,747,300 produced by United's subsidiary, Hoague-Sprague Corp.,

the majority of whose stock was acquired in 1925.

2. Wood Heels, $3,611,855 produced by United's subsidiary, Fred W. Mears Heel Co., Inc. This company represents acquisitions between 1922 and 1928.

3. Lasts, $2,164,916 produced by United's subsidiary, United Last Co., acquired in 1910 and 1931 and supplemented by transfer in 1935 of Framingham Last Co. which had been acquired in 1925.

4. Nails and tacks, $2,046,689 produced by United's subsidiary, W. W. Cross & Co., Inc. acquired before the Sherman Act case.

5. Eyelets, $1,834,610, produced by United's branches J. C. Rhodes & Co. and the S. O. & C. Co., acquired before the Supreme Court's decision in the Sherman Act case.

6. Shanks, $1,734,308, produced by United's branch, United Shank & Findings Co. This company is the result of the acquisition in 1919 of American Shoe Finding Co. and the Union Shank Co., and in 1925 of H. F. Crawford Manufacturing Co.

7. Box toes, $1,677,494, produced by Celastic Corporation, formed in 1925 by United and E. I. du Pont de Nemours Company, each owning 50%.

8. Insole reinforcing material, $1,090,-000, produced by United's subsidiary, B. B. Chemical Co. [At this point, the history of B. B. Chemical Co. can be briefly stated. United acquired in 1900 49.4% interest in a small concern, Boston Blacking Corporation, which had just succeeded to a partnership. In 1929 and 1930 United bought the rest of its stock. B. B. Chemical Co. is that corporation's ultimate successor. B. B.'s research now costs about $400,000 annually.]

9. Clicking dies, $948,316, produced by United's branches, Binghamton Die Plant and St. Louis Die Plant.

10. Finishes, $853,105, produced by United's subsidiary, B. B. Chemical Co., described in 8. above.

11. Cutters and irons, $827,628, produced by United's Beverly plant.

12. Latex and solvent adhesives, $769,-770, produced by United's subsidiary, B. B. Chemical Co., described in 8. above.

13. Sole attaching cement, $609,925, produced by United's subsidiary, B. B. Chemical Co., described in 8. above.

14. Wire, $530,354, distributed by United, but produced by an outside concern, American Steel and Wire Company.

The foregoing 14 types of supply accounted for approximately two-thirds of the total annual sales of supplies, which in the fiscal year ending February 28, 1948 were $28,216,733.

In the foregoing list of 14 supplies reference is made to certain acquisitions. None of the acquisitions was recent. Indeed several were prior to the Supreme Court's judgment in the first Sherman Act case, including all the acquisitions in the fields of nails and tacks and eyelets. B. B. Chemical Company was not in essence an acquisition, but rather a development by United of an interest in an insignificant wax company into a modern chemical laboratory, now employing 375 persons, engaged in research, and selling over $5 million annually. Celastic Corporation is a joint development. No wire business has been acquired. Instead wire is bought under an arrangement by which United orders all of the wire made according to United's specifications by American Steel & Wire Company.

In most of those large supply fields it is too plain for argument that United has not achieved a share of the market which *prima facie* indicates a monopoly. On the evidence most favorable to the Government, for example, United has only 15% of the market for shoe boxes, 25 to 29% of the market for wood heels, 30% of the market for lasts, perhaps 49% of the market for all shanks, roughly 25% of the market for box toes, and perhaps 44% of the market for clicking dies. With respect to shoe boxes, wood heels, lasts and box toes there are other important competitors who plainly limit such market power as defendant has. In shanks and in clicking dies the situation differs, for United is by far the most important in the field. United's success in the shanks and clicking die fields, and in some other fields where United has not half the market but does have more than

any competitor, is often traceable to United's market power in the shoe machinery market, its own long line of supplies, its competitor's short lines, the satisfactory quality of United's products, customer confidence in United, and customer inertia.

The strongest instances of monopoly in the 14 principal revenue producers are nails and tacks where defendant concedes that the percentage is 65.4% though it is probably over 80%; eyelets where it is conceded to be 77.3%, and is probably over 90%; cutters and irons where it is conceded to be 89.7%; and is probably over 90%; and wire which is conceded to be 88.1%, and is probably over 90%.

Before dealing with nails and tacks, eyelets, cutters and irons, and wire, it is important to recognize that what will be said of them applies to certain other smaller supply fields. Cutters and irons fall into the class of expendable parts. What is true of them is also true of the following supplies, in each of which United has over 80% of the market, and in each of which the 1947–1948 annual sales were in thousands of dollars as follows; machine knives, $410; needles and awls, $388; machine brushes, $241; machine awls and drivers, $142; rolls and wheels, $134; and sharpening stones and wheels, $96. Nails and tacks, eyelets, and wire fall into the class of material parts applied by machine. What is true of them is also true of the following supplies in each of which United has over 80% of the market, and in each of which the 1947–1948 annual sales were in thousands of dollars as follows: lacing thread, $202, and fibre fastening $197.

All these supplies are technically closely related to machines. The principal cause of United's success in marketing them is United's market power with respect to shoe machinery. Having roughly an 85% share of the shoe machinery market, and, as a result of the lease system having regular contacts with shoe factories, United is readily able to market over 80% of the supplies in these fields because they so intimately affect the functioning of the machines. Customers already know United, have current business relations with it,

trust it generally, believe it able to specify, select, or manufacture suitable supplies, and are aware that because of the lease provisions United is, as it were, a partner interested in the effective functioning of the machines. Moreover, there is an element of customer inertia favoring United. But there is nothing whatsoever to the Government's allegations that customers are coerced, or are subservient, or are captive, or are deliberately misled by United's representatives.

A secondary cause that has contributed to United's large share of the market in nails and tacks, and eyelets, (as well as to celastic box toes and shanks, where United's market share is under 50%,) is the use of a quantity discount system. This is based on the annual volume of purchases by a single buyer, no matter how distributed throughout the year, or among various plants owned by the buyer. This results in price discrimination to meet competition in selling supplies to the larger buyers who might otherwise turn to sources other than United. Such discrimination indicates the use of market power to limit competition in that segment of the market occupied by large buyers.

United's success in these fields cannot be attributed to its research activities. It did to a large extent set the original specifications for wire, nails and tacks, needles and awls and lacing thread produced by other concerns and distributed by United. It also sets the specifications for the cutters and irons, nails and tacks, eyelets, machine knives, machine brushes, machine awls and drivers, rolls and wheels, sharpening stones, and fibre fastening which United and affiliates themselves manufacture. The setting of these specifications required machine knowledge and was an important technological, and therefore an important social, gain. But this contribution was made long since, and the current sales by United owe virtually nothing to current research or technological advance.

The supply concern on which the Government concentrated its fire, and United concentrates its answer, is B. B. Chemical. It is the source of 4 of the 14 principal sup-

plies: insole reinforcing material, finishes, latex and solvent adhesives, and sole attaching cements. It is also the source of waxes. It supplies tanneries and industries other than shoe and leather.

In the field of waxes B. B. Chemical Co. has over one-half of the market; it sells just under half of all sole reinforcing materials (not merely materials used in the tape reinforcing process); it sells somewhat over a third of all adhesives and a slightly higher percentage of the finishes. In none of these markets except perhaps waxes where the annual sales were $248,-351 in 1947–1948 has United a share comparable to what it has in the nail, tack, eyelet, iron, cutter, and like fields.

B. B. Chemical Co. has carried on significant and useful research in chemical fields, including adhesives, sole attaching cements, and cements. But, the instance of the Griswold research on the tape reinforcing process casts doubt on whether B. B. moves with unusual strides or extraordinary diligence in developing products where competition is not present. It also leads to a reasonable inference that fear of the loss of a market to competition acts as a stimulus to development, and even to the marketing of a product before it has reached the standard which United would ordinarily regard as commercial.

With respect to the suggestion that defendant's success in offering a long line of supplies is traceable to economies of scale, these facts are relevant. The supplies are produced in a great variety of places: from Beverly, from scattered United branches, from United's subsidiaries; and from outside sources. In short, there is no over-all economy of scale in production, though there is some economy of scale in the production at Beverly of cutters and irons, machine knives, abrasives, rolls and wheels, and like supplies. There is certainly economy of scale in distribution, where the total volume of supplies in a particular field is under say half a million dollars, where the supplies are unique to the shoe manufacturing industry, and where the demand spreads widely among the more than 1400 shoe factories.

But this factor decreases in importance in those fields where the dollar volume is large. This is shown in the competition United already has in needles, wire, and nails.

Through its satisfactory service, its important place in the shoe machinery field and its already long line of supply items, United has attracted to itself distributorships from 230 manufacturers. Nine outside concerns distribute some or all of their products to the shoe industry through United and no other outlet. But the arrangements are at will. The same is true of arrangements between United and manufacturers who supply United with all the sharpening stones and wheels, needles and awls, lacing thread, wire, and wire nails that conform to specifications laid down by United. The manufacturers of such supplies may and sometimes do manufacture for others than United similar supplies to meet the specifications of other shoe machinery or shoe factory customers.

These distributorships have flowed to United because of its existing market power and tend to enhance it, yet not one of them as a matter of law precludes the producer from forthwith terminating his arrangement with United and using his own or another concern's distribution channels, if available.

In addition to reciting facts relevant to the question whether United actually has monopolized any market, it is necessary to consider evidence bearing on the question whether United has in miscellaneous tactics exhibited an intent to monopolize any of these fields.

The strongest evidence relates to wood heels. Between 1922 and 1928 there were letters, infringement notices, activities by roadmen, and acquisitions that indicate a purpose to exclude competition. But any attempt to monopolize had plainly been abandoned by 1932 when United refused to acquire another wood heel company. And it would be manifestly improper to enter on the basis of evidence all 20 years old an adjudication directed to a charge not of monopolizing wood heels, but of attempting to monopolize wood heels.

Other evidence was offered as to United's abortive attempts to try to create a technical bond between certain machine types and certain supplies: that is, plastic eyelets and eyelet forming machines; wire and special reels for upper stapling machines; abrasives and machines; lasts and machines. But these plans were not endorsed by senior officers, nor carried to fruition.

## O. Tanning Machinery.

In paragraphs 95 and 96 of the complaint the Government charges that "to preempt the demand of shoe manufacturers for tanning machinery" United between 1920 and 1931 acquired substantially all the capital stock of Turner Tanning Machinery Company, and that in 1929 United caused Turner to acquire the assets of Whitney Machine Company. The following facts were shown with respect to those paragraphs.

United did acquire the stock of Turner between 1920 and 1939. Turner made and makes machines for tanning leather.

In 1928 Turner bought for $3500 from Carleton Ruhe and Carleton Ruhe, Inc. (which was not shown to be a manufacturer of tanning machinery), 16 patents, 4 inventions, and some other items.

At Mr. Whitney's request when the Whitney Company was threatened with bankruptcy, Turner in 1929 bought that company's assets, except book accounts and real estate, but including its fleshing machine business. Whitney's fleshing machines are now part of Turner's line.

In June 1936 Turner bought at a receiver's sale for $560 some dismantled tanning machines and patents, which had first been privately offered by the receiver to several persons.

From 1938 until the beginning of World War II United and Turner engaged in a joint research program, each company paying half the cost.

In 1947 United began a new program of research. This has led to the development of a dust removal machine (now used by 10 to 25% of the tanneries) and some other machines. It has also led to fundamental research in the fields of leather and tanning.

On tanning research United spent $972,599.-78 from April 1947 to December 31, 1950.

By arrangement with Turner, United markets the dust-removal machines on a lease only basis. It rents them at $80 a month, and services them without additional charge. United plans to market on a lease basis such new tannery machinery as it may develop. Turner itself does not market the machine types which United leases; it markets other types of tanning machinery, but solely on a sale basis.

There is no adequate basis for finding what share of the tanning machinery market Turner supplies. All that can be said is that there is some evidence that about 65% of the market consists not of Turner machines, but of machines of the generic type manufactured by Turner. In that 65% of the market Turner *may* have a 65% share, and if this is so Turner has no more than 43% of the tanning machinery market. Probably the correct figure is much lower.

The foregoing findings with respect to Turner are obviously sketchy. But the record has no coordinated, significant facts. It would give a false impression if the Court were to write this phase of the case so as to give system to what is a meaningless miscellany.

## III.

### Opinion on Alleged Violations.

As an introduction to the discussion of law, the following half dozen pages draw upon the previous eighty-five pages of findings of fact for a summary statement of the structure of the shoe machinery market, and United's power and, to some extent, its performance within that market.

There are 18 major processes for the manufacturing of shoes by machine. Some machine types are used only in one process, but others are used in several; and the relationship of machine types to one another may be competitive or sequential. The approximately 1460 shoe manufacturers themselves are highly competitive in many respects, including their choice of processes and other technological aspects of production. Their total demand for machine services, apart from those rendered by dry thread sewing machines in the upper-fitting

room, constitutes an identifiable market which is a "part of the trade or commerce among the several States". § 2 of the Sherman Act, 15 U.S.C.A. § 2.

United, the largest source of supply, is a corporation lineally descended from a combination of constituent companies, adjudged lawful by the Supreme Court of the United States in 1918. United States v. United Shoe Machinery Co. of N. J., 247 U.S. 32, 38 S.Ct. 473, 62 L.Ed. 968. It now has assets rising slightly over 100 million dollars and employment rolls around 6,000. In recent years it has earned before federal taxes 9 to 13.5 million dollars annually.

Supplying different aspects of that market are at least 10 other American manufacturers and some foreign manufacturers, whose products are admitted to the United States free of tariff duty. Almost all the operations performed in the 18 processes can be carried out without the use of any of United's machines, and (at least in foreign areas, where patents are no obstacle,) a complete shoe factory can be efficiently organized without a United machine.

Nonetheless, United at the present time is supplying over 75%, and probably 85%, of the current demand in the American shoe machinery market, as heretofore defined. This is somewhat less than the share it was supplying in 1915. In the meantime, one important competitor, Compo Shoe Machinery Corporation, became the American innovator of the cement process of manufacture. In that sub-market Compo roughly equals United.

Machine types in all processes vary greatly in character. The more complex ones are the important revenue producers in the industry. They must be designed with great engineering skill, require large investments of time and money, and demand a knowledge of the art of shoemaking. Otherwise they cannot meet extraordinary elements of variability resulting from the variety of manufacturing processes and sub-processes, the preliminary preparatory stages of manufacture, the lasts, the sizes, the leather, and other aspects of the shoemaking business.

Once designed, a shoe machine can be copied, as German competitors have shown. But the copying is not easy, and an American machine manufacturer unfamiliar with the art of shoemaking would not ordinarily enter the field even if United gave him technical assistance, at least, unless he were assured that he would be encouraged to continue making similar machines for a long time.

United is the only machinery enterprise that produces a long line of machine types, and covers every major process. It is the only concern that has a research laboratory covering all aspects of the needs of shoe manufacturing; though Compo has a laboratory concentrating on the needs of those in the cement process. United's heavy research expenditures, over $3 million annually, have been pro-rated roughly according to those fields where maximum revenue has been or could be attained, and, except in the cement process, often in inverse proportion to actual competition. Through its own research, United has developed inventions many of which are now patented. Roughly 95% of its 3915 patents are attributable to the ideas of its own employees.

Although at the turn of the century, United's patents covered the fundamentals of shoe machinery manufacture, those fundamental patents have expired. Current patents cover for the most part only minor developments, so that it is possible to "invent around" them, to use the words of United's chief competitor. However, the aggregation of patents does to some extent block potential competition. It furnishes a trading advantage. It leads inventors to offer their ideas to United, on the general principle that new complicated machines embody numerous patents. And it serves as a hedge or insurance for United against unforeseen competitive developments.

In the last decade and a half, United has not acquired any significant patents, inventions, machines, or businesses from any outside source, and has rejected many offers made to it. Before then, while it acquired no going businesses, in a period of two decades it spent roughly $3,500,000 to purchase inventions and machines. Most of these were from moribund companies, though this was not true of the acquisitions underlying the significant Littleway process.

and the less significant heel seat fitting machines and patents, each of which was from an active enterprise and might have served as a nucleus of important, though, at least initially, not extensive competition.

In supplying its complicated machines to shoe manufacturers, United, like its more important American competitors, has followed the practice of never selling, but only leasing. Leasing has been traditional in the shoe machinery field since the Civil War. So far as this record indicates, there is virtually no expressed dissatisfaction from consumers respecting that system; and Compo, United's principal competitor, endorses and uses it. Under the system, entry into shoe manufacture has been easy. The rates charged for all customers have been uniform. The machines supplied have performed excellently. United has, without separate charge, promptly and efficiently supplied repair service and many kinds of other service useful to shoe manufacturers. These services have been particularly important, because in the shoe manufacturing industry a whole line of production can be adversely affected, and valuable time lost, if some of the important machines go out of function, and because machine breakdowns have serious labor and consumer repercussions. The cost to the average shoe manufacturer of its machines and services supplied to him has been less than 2% of the wholesale price of his shoes.

However, United's leases, in the context of the present shoe machinery market, have created barriers to the entry by competitors into the shoe machinery field.

First, the complex of obligations and rights accruing under United's leasing system in operation deter a shoe manufacturer from disposing of a United machine and acquiring a competitor's machine. He is deterred more than if he owned that same United machine, or if he held it on a short lease carrying simple rental provisions and a reasonable charge for cancelation before the end of the term. The lessee is now held closely to United by the combined effect of the 10 year term, the requirement that if he has work available he must use the machine to full capacity, and by the return charge which can in practice, through the right of

deduction fund, be reduced to insignificance if he keeps this and other United machines to the end of the periods for which he leased them.

Second, when a lessee desires to replace a United machine, United gives him more favorable terms if the replacement is by another United machine than if it is by a competitive machine.

Third, United's practice of offering to repair, without separate charges, its leased machines, has had the effect that there are no independent service organizations to repair complicated machines. In turn, this has had the effect that the manufacturer of a complicated machine must either offer repair service with his machine, or must face the obstacle of marketing his machine to customers who know that repair service will be difficult to provide.

Through its success with its principal and more complicated machines, United has been able to market more successfully its other machines, whether offered only for sale, or on optional sale or lease terms. In ascending order of importance, the reasons for United's success with these simpler types are these. These other, usually more simple, machines are technologically related to the complex leased machines to which they are auxiliary or preparatory. Having business relations with, and a host of contacts with, shoe factories, United seems to many of them the most efficient, normal, and above all, convenient supplier. Finally, United has promoted the sale of these simple machine types by the sort of price discrimination between machine types, about to be stated.

Although maintaining the same nominal terms for each customer, United has followed, as between machine types, a discriminatory pricing policy. Clear examples of this policy are furnished by the nine selected instances reviewed in detail in the findings. Other examples of this policy can be found in the wide, and relatively permanent, variations in the rates of return United secures upon its long line of machine types. United's own internal documents reveal that these sharp and relatively durable differentials are traceable, at least in large part, to United's policy of fixing a

higher rate of return where competition is of minor significance, and a lower rate of return where competition is of major significance. Defendant has not borne the burden of showing that these variations in rates of return were motivated by, or correspond with, variations in the strength of the patent protection applicable to different machine types. Hence there is on this record no room for the argument that defendant's discriminatory pricing policy is entirely traceable to, and justified by, the patent laws of the United States.

On the foregoing facts, the issue of law is whether defendant in its shoe machinery business has violated that provision of § 2 of the Sherman Act, 15 U.S.C.A. § 2, addressed to "Every person who shall monopolize, or attempt to monopolize * * * any part of the trade or commerce among the several States".

The historical development of that statutory section can be speedily recapitulated.

When they proposed the legislation, Senators Hoar and Edmunds thought it did little more than bring national authority to bear upon restraints of trade known to the common law, and it could not apply to one "who merely by superior skill and intelligence * * * got the whole business because nobody could do it as well". [21 Cong.Rec. 3146–3152]. They did not discuss the intermediate case where the causes of an enterprise's success were neither common law restraints of trade, nor the skill with which the business was conducted, but rather some practice which without being predatory, abusive, or coercive was in economic effect exclusionary.

Early Supreme Court decisions went in different directions, until Mr. Justice White announced "the 'rule of reason'" in 1911 in Standard Oil Co. of New Jersey v. United States, 221 U.S. 1, 31 S.Ct. 502, 531, 55 L.Ed. 619, and United States v. American Tobacco Co., 221 U.S. 106, 31 S.Ct. 632, 55 L.Ed. 663. His opinions encouraged the view that there was no monopolization unless defendant had resorted to predatory practices. And this was unquestionably the view to which Mr. Justice McKenna led the Court in United States v. United Shoe Machinery Company of N. J., 247 U.S. 32, 38

S.Ct. 473, 62 L.Ed. 968 and United States v. United States Steel Corp., 251 U.S. 417, 40 S.Ct. 293, 64 L.Ed. 343. But a reversal of trend was effectuated through the landmark opinion of Judge Learned Hand in United States v. Aluminum Co. of America, 2 Cir., 148 F.2d 416.

In Aluminum Judge Hand, perhaps because he was cabined by the findings of the District Court, did not rest his judgment on the corporation's coercive or immoral practices. Instead, adopting an economic approach, he defined the appropriate market, found that Alcoa supplied 90% of it, determined that this control constituted a monopoly, and ruled that since Alcoa established this monopoly by its voluntary actions, such as building new plants, though, it was assumed, not by moral derelictions, it had "monopolized" in violation of § 2. Judge Hand reserved the issue as to whether an enterprise could be said to "monopolize" if its control was purely the result of technological, production, distribution, or like objective factors, not dictated by the enterprise, but thrust upon it by the economic character of the industry; and he also reserved the question as to control achieved solely "by virtue of * * * superior skill, foresight and industry." At the same time, he emphasized that an enterprise had "monopolized" if, regardless of its intent, it had achieved a monopoly by manoeuvres which, though "honestly industrial", were not economically inevitable, but were rather the result of the firm's free choice of business policies.

The justification for this interpretation of the law Judge Hand found in the purposes of the Sherman Act, which he stated in language often quoted, 148 F.2d at page 427. He referred to the economic purpose in these words:

"Many people believe that possession of unchallenged economic power deadens initiative, discourages thrift and depresses energy; that immunity from competition is a narcotic, and rivalry is a stimulant, to industrial progress; that the spur of constant stress is necessary to counteract an inevitable disposition to let well enough alone."

And he referred to the social purpose in this passage:

"It is possible, because of its indirect social or moral effect, to prefer a system of small producers, each dependent for his success upon his own skill and character, to one in which the great mass of those engaged must accept the direction of a few."

Both the technique and the language of Judge Hand were expressly approved in American Tobacco Co. v. United States, 1946, 328 U.S. 781, 66 S.Ct. 1125, 90 L. Ed. 1575. Comparable principles were applied in United States v. Griffith, 1948, 334 U.S. 100, 68 S.Ct. 941, 92 L.Ed. 1236; Schine Chain Theatres, Inc. v. United States, 1948, 334 U.S. 110, 68 S.Ct. 947, 92 L.Ed. 1245; United States v. Paramount Theatres, Inc., 1948, 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260 and, also, though the Government lost the case, in United States v. Columbia Steel Co., 1948, 334 U.S. 495, 68 S.Ct. 1107, 92 L.Ed. 1533.

Counsel appearing before this Court have spent much effort in analyzing the precise holdings in these cases. Though this analysis has been helpful, a District Judge knows that he cannot give any authoritative reconciliation of opinions rendered by appellate courts. And in connection with the Sherman Act, it is delusive to treat opinions written by different judges at different times as pieces of a jig-saw puzzle which can be, by effort, fitted correctly into a single pattern.

Yet, in these recent authorities there are discernible at least three different, but cognate, approaches.

The approach which has the least sweeping implications really antedates the decision in Aluminum. But it deserves restatement. An enterprise has monopolized in violation of § 2 of the Sherman Act if it has acquired or maintained a power to exclude others as a result of using an unreasonable "restraint of trade" in violation of § 1 of the Sherman Act. See United States v. Columbia Steel Co., 334 U.S. 495, 525; see also p. 518, lines 25–30, 68 S.Ct. 1107, 1119, 92 L.Ed. 1533; United States v.

Griffith, 334 U.S. 100, 106, lines 20–23, 68 S.Ct. 941, 92 L.Ed. 1236.

A more inclusive approach was adopted by Mr. Justice Douglas in United States v. Griffith, 334 U.S. 100, 68 S.Ct. 941. He stated that to prove a violation of § 2 it was not always necessary to show a violation of § 1, 334 U.S. at page 106, 68 S.Ct. at page 945. And he concluded that an enterprise has monopolized in violation of § 2 if it (a) has the power to exclude competition, and (b) has exercised it, or has the purpose to exercise it, 334 U.S. at page 107, 68 S.Ct. at page 945. The least that this conclusion means is that it is a violation of § 2 for one having effective control of the market to use, or plan to use, any exclusionary practice, even though it is not a technical restraint of trade. But the conclusion may go further.

Indeed the way in which Mr. Justice Douglas used the terms "monopoly power" and "effective market control", 334 U.S. 100, 107, lines 2 and 6, 68 S.Ct. 941, at page 945, and cited Aluminum suggests that he endorses a third and broader approach, which originated with Judge Hand. It will be recalled that Judge Hand said that one who has acquired an overwhelming share of the market "monopolizes" whenever he does business, 148 F.2d at page 428, column 1, apparently even if there is no showing that his business involves any exclusionary practice. But, it will also be recalled that this doctrine is softened by Judge Hand's suggestion that the defendant may escape statutory liability if it bears the burden of proving that it owes its monopoly solely to superior skill, superior products, natural advantages, (including accessibility to raw materials or markets), economic or technological efficiency, (including scientific research), low margins of profit maintained permanently and without discrimination, or licenses conferred by, and used within, the limits of law, (including patents on one's own inventions, or franchises granted directly to the enterprise by a public authority).

In the case at bar, the Government contends that the evidence satisfies each of the three approaches to § 2 of the Sherman Act,

so that it does not matter which one is taken.

If the matter were *res integra,* this Court would adopt the first approach, and, as a preliminary step to ruling upon § 2, would hold that it is a restraint of trade under § 1 for a company having an overwhelming share of the market, to distribute its more important products only by leases which have provisions that go beyond assuring prompt, periodic payments of rentals, which are not terminable cheaply, which involve discrimination against competition, and which combine in one contract the right to use the product and to have it serviced. But this inferior court feels precluded from so deciding because of the overhanging shadows of United States v. United Shoe Machinery Co. of N. J., 247 U.S. 32, 38 S. Ct. 473, 62 L.Ed. 968, and United Shoe Machinery Corp. v. United States, 258 U.S. 451, 42 S.Ct. 363, 66 L.Ed. 708, the Sherman and Clayton Act cases involving this company's predecessor and itself. Though these cases may ultimately be overruled by the Supreme Court, they have not yet lost all authority. See Hartford Empire Co. v. United States, 1945, 323 U.S. 386, 412, footnote 10, 65 S.Ct. 373, 89 L.Ed. 322.

■ This Court finds it unnecessary to choose between the second and third approaches. For, taken as a whole, the evidence satisfies the tests laid down in both Griffith and Aluminum. The facts show that (1) defendant has, and exercises, such overwhelming strength in the shoe machinery market that it controls that market, (2) this strength excludes some potential, and limits some actual, competition, and (3) this strength is not attributable solely to defendant's ability, economies of scale, research, natural advantages, and adaptation to inevitable economic laws.

In estimating defendant's strength, this Court gives some weight to the 75 plus percentage of the shoe machinery market which United serves.[1] But the Court considers other factors as well. In the relatively static shoe machinery market where there are no sudden changes in the style of machines or in the volume of demand, United has a network of long-term, complicated leases with over 90% of the shoe factories. These leases assure closer and more frequent contacts between United and its customers than would exist if United were a seller and its customers were buyers. Beyond this general quality, these leases are so drawn and so applied as to strengthen United's power to exclude competitors. Moreover, United offers a long line of machine types, while no competitor offers more than a short line. Since in some parts of its line United faces no important competition, United has the power to discriminate, by wide differentials and over long periods of time, in the rate of return it procures from different machine types. Furthermore, being by far the largest company in the field, with by far the largest resources in dollars, in patents, in facilities, and in

[1]. This is in accord with the ruling in United State v. Columbia Steel Co., 334 U.S. 495, 527–528, 68 S.Ct. 1107, 92 L. Ed. 1533 (though Mr. Justice Reed was addressing himself primarily to problems under § 1, not § 2, of the Sherman Act). This Court does not consider whether this high percentage, by itself, would warrant (but not compel) an inference that United has such overwhelming strength that it could exclude competition. Nor does this Court consider whether, drawing upon United States v. Griffith, 334 U.S. 100, 107, footnote 10, 68 S.Ct. 941, 92 L.Ed. 1236, and United States v. Aluminum Co. of America, 2 Cir., 148 F.2d 416, 428, 429, a bold, original court, mindful of what legal history teaches about the usual, if not invariable, relationship between overwhelming percentage of the market and control of the market, and desirous of enabling trial judges to escape the morass of economic data in which they are now plunged, might, on the basis of considerations of experience and judicial convenience, announce that an enterprise having an overwhelming percentage of the market was presumed to have monopoly power, that a plaintiff bore its burden of proof under § 2 of the Sherman Act if it satisfied the trier of fact that defendant had the prohibited percentage, and that defendant, to escape liability, must bear the burden of proving that its share of the market was attributable to its ability, natural advantage, legal license, or, perhaps, to others' lack of interest in entering the market.

knowledge, United has a marked capacity to attract offers of inventions, inventors' services, and shoe machinery businesses. And, finally, there is no substantial substitute competition from a vigorous secondhand market in shoe machinery.

To combat United's market control, a competitor must be prepared with knowledge of shoemaking, engineering skill, capacity to invent around patents, and financial resources sufficient to bear the expense of long developmental and experimental processes. The competitor must be prepared for consumers' resistance founded on their long-term, satisfactory relations with United, and on the cost to them of surrendering United's leases. Also, the competitor must be prepared to give, or point to the source of, repair and other services, and to the source of supplies for machine parts, expendable parts, and the like. Indeed, perhaps a competitor who aims at any large scale success must also be prepared to lease his machines. These considerations would all affect *potential* competition, and have not been without their effect on *actual* competition.

Not only does the evidence show United has control of the market, but also the evidence does not show that the control is due entirely to excusable causes. The three principal sources of United's power have been the original constitution of the company, the superiority of United's products and services, and the leasing system. The first two of these are plainly beyond reproach. The original constitution of United in 1899 was judicially approved in United States v. United Shoe Machinery Company of New Jersey, 247 U.S. 32, 38 S.Ct. 473, 62 L.Ed. 968. It is no longer open to question, and must be regarded as protected by the doctrine of *res judicata,* which is the equivalent of a legal license. Likewise beyond criticism is the high quality of United's products, its understanding of the techniques of shoemaking and the needs of shoe manufacturers, its efficient design and improvement of machines, and its prompt and knowledgeable service. These have illustrated in manifold ways that "superior skill, foresight and industry"

of which Judge Hand spoke in Aluminum, 148 F.2d at page 430.

But United's control does not rest solely on its original constitution, its ability, its research, or its economies of scale. There are other barriers to competition, and these barriers were erected by United's own business policies. Much of United's market power is traceable to the magnetic ties inherent in its system of leasing, and not selling, its more important machines. The lease-only system of distributing complicated machines has many "partnership" aspects, and it has exclusionary features such as the 10-year term, the full capacity clause, the return charges, and the failure to segregate service charges from machine charges. Moreover, the leasing system has aided United in maintaining a pricing system which discriminates between machine types.

In addition to the foregoing three principal sources of United's power, brief reference may be made to the fact that United has been somewhat aided in retaining control of the shoe machinery industry by its purchases in the secondhand market, by its acquisitions of patents, and, to a lesser extent, by its activities in selling to shoe factories supplies which United and others manufacture.

In one sense, the leasing system and the miscellaneous activities just referred to (except United's purchases in the secondhand market) were natural and normal, for they were, in Judge Hand's words, "honestly industrial". 148 F.2d at page 431. They are the sort of activities which would be engaged in by other honorable firms. And, to a large extent, the leasing practices conform to long-standing traditions in the shoe machinery business. Yet, they are not practices which can be properly described as the inevitable consequences of ability, natural forces, or law. They represent something more than the use of accessible resources, the process of invention and innovation, and the employment of those techniques of employment, financing, production, and distribution, which a competitive society must foster. They are contracts, arrangements, and policies which,

instead of encouraging competition based on pure merit, further the dominance of a particular firm. In this sense, they are unnatural barriers; they unnecessarily exclude actual and potential competition; they restrict a free market. While the law allows many enterprises to use such practices, the Sherman Act is now construed by superior courts to forbid the continuance of effective market control based in part upon such practices. Those courts hold that market control is inherently evil and constitutes a violation of § 2 unless economically inevitable, or specifically authorized and regulated by law.[2]

It is only fair to add that the more than 14,000 page record, and the more than 5,000 exhibits, representing the diligent seven year search made by Government counsel aided by this Court's orders giving them full access to United's files during the last 40 years, show that United's power does not rest on predatory practices. Probably few monopolies could produce a record so free from any taint of that kind of wrongdoing. The violation with which United is now charged depends not on moral considerations, but on solely economic considerations. United is denied the right to exercise effective control of the market by business policies that are not the inevitable consequences of its capacities or its natural advantages. That those policies are not immoral is irrelevant.

Defendant seems to suggest that even if its control of the market is not attributable exclusively to its superior performance, its research, and its economies of scale, nonetheless, United's market control should not be held unlawful, because only through the existence of some monopoly power can the thin shoe machinery market support fundamental research of the first order, and achieve maximum economies of production and distribution.

■■ To this defense the shortest answer is that the law does not allow an enterprise that maintains control of a market through practices not economically inevitable, to justify that control because of its supposed social advantage. Cf. Fashion Originators' Guild of America v. Federal Trade Commission, 312 U.S. 457, 668, 61 S. Ct. 703, 85 L.Ed. 949. It is for Congress, not for private interests, to determine whether a monopoly, not compelled by circumstances, is advantageous. And it is for Congress to decide on what conditions, and subject to what regulations, such a monopoly shall conduct its business.

Moreover, if the defense were available, United has not proved that monoply is economically compelled by the thinness of the shoe machinery market. It has not shown that no company could undertake to develop, manufacture, and distribute certain types of machines, unless it alone met the total demand for those types of machines.

Nor has United affirmatively proved that it has achieved spectacular results at amazing rates of speed, nor has it proved that comparable research results and comparable economies of production, distribution, and service could not be achieved as well by, say, three important shoe machinery firms, as by one. Compo with a much smaller organization indicates how much research can be done on a smaller scale. Yet since Compo is limited to the simpler

2. Underlying much of defendant's argument is the basic contention that Aluminum, Griffith, and related cases represent an unsound interpretation of the Sherman Act and an unwise public policy. A District Judge must leave this contention to the Supreme Court and to Congress. They are the only tribunals competent to consider whether appellate courts have unjustifiably gone beyond the 1890 legislative concern with force and fraud, with combination and conspiracy, and with the growth of trusts dwarfing ordinary men and ordinary governmental units; whether it is appropriate to read a statute having criminal and treble damage provisions as applying to the mere exercise of effective control of the market; and whether Congress contemplated the use of trial courts, moving within the traditional limits of judicial procedure and of legally admissible evidence, to solve subtle, complex, extensive economic controversies for which judges are not always well suited, and which hinder the prompt disposition of other meritorious cases.

cement process machines, too much reliance should not be placed on this comparison. Nonetheless, one point is worth recalling. Compo's inventors first found practical ways to introduce the cement process which United had considered and rejected. This experience illustrates the familiar truth that one of the dangers of extraordinary experience is that those who have it may fall into grooves created by their own expertness. They refuse to believe that hurdles which they have learned from experience are insurmountable, can in fact be overcome by fresh, independent minds.

So far, nothing in this opinion has been said of defendant's *intent* in regard to its power and practices in the shoe machinery market. This point can be readily disposed of by reference once more to Aluminum, 148 F.2d at pages 431–432. Defendant intended to engage in the leasing practices and pricing policies which maintained its market power. That is all the intent which the law requires when both the complaint and the judgment rest on a charge of "monopolizing", not merely "attempting to monopolize". Defendant having willed the means, has willed the end.

Next, come those issues relating to supplies, each of which is, for factual reasons stated in the findings, a separate market under § 2 of the Sherman Act.

The most important fact with respect to United's manufacturing and distributive activities in these supply markets is that they are a consequence of United's power in the shoe machinery market and to some extent buttress that power.

■ In certain of those supply fields such as cutters and irons, nails and tacks, eyelets, and wire, United has control of the market as is shown by the fact that it is supplying much more than half the demand. This control comes principally from United's power over the shoe machinery market. And for that reason the exercise of dominant power in those supply fields is unlawful. An enterprise that by monopolizing one field, secures dominant market power in another field, has monopolized the second field, in violation of § 2 of the Sherman Act.

With respect to the miscellaneous supply fields such as shoe boxes, lasts, wood heels, shanks, adhesives, finishes, and reinforcing material, where United has not over 50% of the share of the market, it has nothing more than a limited market power flowing from its generally long line of supplies, its many business relations with shoe manufacturers, and its competitors' comparative weakness in resources and variety of products. The consequence is that in these fields United has not such market power as to furnish a basis for a conclusion that it has monopolized the field.

So far as concerns the charge that United has *attempted* to monopolize those fields, the Government would have had to show that defendant had a specific intent or plan to monopolize those markets. See Aluminum, 148 F.2d at pages 431–432. No such intent was proved. The only evidence of any consequence was two decades old, and related mostly to wood heels. That will not warrant a finding adverse to defendant.

■ Finally, comes tanning machinery made by Turner. There is no evidence that United has dominant market power, and there is no evidence of a plan to monopolize. The leases are, it is true, like United's shoe machinery leases. But, as has been previously emphasized in this opinion, this Court does not rule that leases of that type are in every context restraints of trade, or otherwise unlawful. All that this opinion has ruled is that when control of the market has been obtained in large part by such leases, the market power cannot be said to have been thrust upon its holder through its own skill, energy, and initiative, or through technological conditions of production and distribution, or the inevitable characteristics of the market. In short, the leases themselves are not forbidden; only when they are used as an instrument for seeking market control is the lessor to be charged with using them in an attempt to monopolize. Such use of tanning machinery leases was not proved.

## IV.
### Opinion on Remedy.

Where a defendant has monopolized commerce in violation of § 2, the principal

objects of the decrees are to extirpate practices that have caused or may hereafter cause monopolization, and to restore workable competition in the market.

A trial judge, until he is otherwise directed by the Supreme Court or Congress, (see 110 F.Supp. 345 footnote 2, supra, must frame a decree upon the basis of the presuppositions underlying Aluminum and Griffith. He must accept these as the premises of the current interpretation of § 2 of the Sherman Act. Concentrations of power, no matter how beneficently they appear to have acted, nor what advantages they seem to possess, are inherently dangerous. Their good behavior in the past may not be continued; and if their strength were hereafter grasped by presumptuous hands, there would be no automatic check and balance from equal forces in the industrial market. And in the absence of this protective mechanism, the demand for public regulation, public ownership, or other drastic measures would become irresistible in time of crisis. Dispersal of private economic power is thus one of the ways to preserve the system of private enterprise. Moreover, well as a monopoly may have behaved in the moral sense, its economic performance is inevitably suspect. The very absence of strong competitors implies that there cannot be an objective measuring rod of the monopolist's excellence, and the test of its performance must, therefore, be largely theoretical. What appears to the outsider to be a sensible, prudent, nay even a progressive policy of the monopolist, may in fact reflect a lower scale of adventurousness and less intelligent risk-taking than would be the case if the enterprise were forced to respond to a stronger industrial challenge. Some truth lurks in the cynical remark that not high profits but a quiet life is the chief reward of monopoly power. And even if a particular enterprise seeks growth and not repose, an increased rate in the growth of ideas does not follow from an increased concentration of power. Industrial advance may indeed be in inverse proportion to economic power; for creativity in business as in other areas, is best nourished by multiple centers of activity, each following its unique pattern and developing its own esprit de corps to respond to the challenge of competition. The dominance of any one enterprise inevitably unduly accentuates that enterprise's experience and views as to what is possible, practical, and desirable with respect to technological development, research, relations with producers, employees, and customers. And the preservation of any unregulated monopoly is hostile to the industrial and political ideals of an open society founded on the faith that tomorrow will produce a better than the best.

Yet a trial judge's decree attempting to recreate a competitive market should be drafted in the spirit which has been attributed to Lord Acton—the most philosophical mind that has ever been directed to the evils of concentration of power. "No one can be sure what view Acton would have adopted on contemporary economic issues. What is certain is the principles and tests he would have employed. Of every proposal he would have asked, Is it just? Is it in accordance with the permanent will of the community? Is it practicable? Will it be efficient? Will it increase or diminish real freedom?". Fasnacht, Acton's Political Philosophy (1952), p. 124.

Judges in prescribing remedies have known their own limitations. They do not ex officio have economic or political training. Their prophecies as to the economic future are not guided by unusually subtle judgment. They are not so representative as other branches of the government. The recommendations they receive from government prosecutors do not always reflect the over-all approach of even the executive branch of the government, sometimes not indeed the seasoned and fairly informed judgment of the head of the Department of Justice. Hearings in court do not usually give the remote judge as sound a feeling for the realities of a situation as other procedures do. Judicial decrees must be fitted into the framework of what a busy, and none too expert, court can supervise. Above all, no matter with what authority he is invested, with what facts and opinion

he is supplied, a trial judge is only one man, and should move with caution and humility.

That considerations of this type have always affected anti-trust courts is plain from the history of the Standard Oil, American Tobacco and Alcoa cases. To many champions of the anti-trust laws these cases indicate judicial timidity, economic innocence, lack of conviction, or paralysis of resolution. Yet there is another way of interpreting this judicial history. In the anti-trust field the courts have been accorded, by common consent, an authority they have in no other branch of enacted law. Indeed, the only comparable examples of the power of judges is the economic role they formerly exercised under the Fourteenth Amendment, and the role they now exercise in the area of civil liberties. They would not have been given, or allowed to keep, such authority in the anti-trust field, and they would not so freely have altered from time to time the interpretation of its substantive provisions, if courts were in the habit of proceeding with the surgical ruthlessness that might commend itself to those seeking absolute assurance that there will be workable competition, and to those aiming at immediate realization of the social, political, and economic advantages of dispersal of power.

Such self-restraining considerations have peculiar force in this case. Until Alcoa lost its case in 1945, there was no significant reason to suppose that United's conduct violated § 2 of the Sherman Act. The Supreme Court had three times, in United States v. Winslow, 227 U.S. 202, 33 S.Ct. 253, 57 L.Ed. 481, United States v. United Shoe Machinery Company of N. J., 247 U.S. 32, and United Shoe Machinery Corp. v. United States, 258 U.S. 451, 42 S.Ct. 363, 66 L.Ed. 708 reviewed aspects of this company's, or its predecessor's, activities. What United is now doing is similar to what it was then doing, but the activities which were similar stood uncondemned,— indeed, one ought to go further and say they were in part endorsed. In the face of these decisions, it would be anomalous to charge the officers of United with any moral deficiency.

In the light of these general considerations, it is now meet to consider four of the principal problems respecting a proposed decree: first, dissolution, second, treatment of the leases, third, divestiture of supply activities, and fourth, patents.

The Government's proposal that the Court dissolve United into three separate manufacturing companies is unrealistic. United conducts all machine manufacture at one plant in Beverly, with one set of jigs and tools, one foundry, one laboratory for machinery problems, one managerial staff, and one labor force. It takes no Solomon to see that this organism cannot be cut into three equal and viable parts.

Nor can the division of United's business be fairly accomplished by dividing the manufacture of machinery into three broad categories, and then issuing an injunction restraining the Beverly plant from manufacturing two broad categories of machine types, and vesting in each of two new companies the right to manufacture one of those categories. Such an order would create for the new companies the most serious type of problems respecting the acquisition of physical equipment, the raising of new capital, the allotment of managerial and labor forces, and so forth. The prospect of creating three factories where one grew before has not been thought through by its proponents.

A petition for dissolution should reflect greater attention to practical problems and should involve supporting economic data and prophesies such as are presented in corporate reorganization and public utility dissolution cases. Moreover, the petition should involve a more formal commitment by the Attorney General, than is involved in the divergent proposals that his assistants have made in briefs and in oral arguments addressed to the Court.

On the whole, therefore, the suggested remedy of dissolution is rejected.

From the opinion on defendant's violations it follows that some form of relief regarding defendant's leases and leasing practices is proper and necessary.

The Government does not propose that United should cease leasing machines. It

does suggest that this Court order defendant to eliminate from the leases those provisions found to be restrictive, to offer for sale every type of machine which it offers for lease, and to make the sales terms somewhat more advantageous to customers, than the lease terms.

The Court agrees that it would be undesirable, at least until milder remedies have been tried, to direct United to abolish leasing forthwith. United is free to abolish leasing if it chooses to do so, but this Court hesitates to lay down any absolute ban for two reasons. First, if a ban were immediately applied, a substantial number of shoe factories would probably be put out of business, for they have not the assets, nor the capacity to borrow, requisite to purchase machines, even on conditional sales agreements. Second, if this Court forbade United to lease machines, it could not apply a similar ban to its competitors. This would constitute for United a major not a minor competitive handicap if one accepts the testimony of the large number of shoe manufacturers who have already expressed their preference for leasing rather than buying machines. How deeply rooted is this preference might be disputed; but it cannot be denied that virtually all the shoe manufacturers who took the stand, and the 45 shoe manufacturers who were selected as a sample by the Court, expressed a preference for the leasing system. It is, of course, possible that through inertia, fear of reprisal, or other motives, those who oppose the leasing system did not speak up. Yet, the number of dissenters must be small. Moreover, Compo, which is United's chief rival, and which the Government claims was a chief victim of United's policies, favors the leasing system, and might encourage shoe factories to continue leasing.

Although leasing should not now be abolished by judicial decree, the Court agrees with the Government that the leases should be purged of their restrictive features. In the decree filed herewith, the term of the lease is shortened, the full capacity clause is eliminated, the discriminatory commutative charges are removed, and United is required to segregate its charges for machines from its charges for repair service. For the most part, the decree speaks plainly enough upon these points. Yet, on two matters, a further word is in order.

The decree does not prohibit United from rendering service, because, in the Court's view, the rendition of service, if separately charged for, has no exclusionary effects. Moreover, the rendition of service by United will keep its research and manufacturing divisions abreast of technological problems in the shoe manufacturing industry; and this will be an economic advantage of the type fostered by the Sherman Act.

Nor does the decree attempt to deal with that feature of United's pricing policy which discriminates between machine types. To try to extirpate such discrimination would require either an order directing a uniform rate of markup, or an order subjecting each price term and each price change to judicial supervision. Neither course would be sound. Some price discrimination, if not too rigid, is inevitable. Some may be justified as resting on patent monopolies. Some price discrimination is economically desirable, if it promotes competition in a market where several multiproduct firms compete. And while price discrimination has been an evidence of United's monopoly power, a buttress to it, and a cause of its perpetuation, its eradication cannot be accomplished without turning United into a public utility, and the Court into a public utility commission, or requiring United to observe a general injunction of non-discrimination between different products—an injunction which would be contrary to sound theory, which would require the use of practices not followed in any business known to the Court, and which could not be enforced.

The Court also agrees with the Government that if United chooses to continue to lease any machine type, it must offer that type of machine also for sale. The principal merit of this proposal does not lie in its primary impact, that is, in its effect in widening the choices open to owners of shoe factories. For present purposes it may be assumed that the anti-trust laws are not designed, chiefly, if at all, to give a customer choice as to the selling methods

by which his supplier offers that supplier's own products. The merit of the Government's proposal is in its secondary impact. Insofar as United's machines are sold rather than leased, they will ultimately, in many cases, reach a second-hand market. From that market, United will face a type of substitute competition which will gradually weaken the prohibited market power which it now exercises. Moreover, from that market, or from United itself, a competitor of United can acquire a United machine in order to study it, to copy its unpatented features, and to experiment with improvements in, or alterations of, the machine. Thus, in another and more direct way, United's market power will be diminished.

Furthermore, the creation of a sales market together with the purging of the restrictive features of the leases will, in combination, gradually diminish the magnetic hold now exercised by what United properly describes as the partnership features of the leasing system. As United's relationships with its customers grow feebler, competitors will have an enhanced opportunity to market their wares.

Two objections to this proposal should now be answered.

First, United emphasizes the point that if a decree requires United to offer for sale all machine types which it leases, the decree will discriminate against United, because its competitors will be subject to no parallel injunction. United says that this discrimination violates United's legal rights. In support of this contention, United relies upon the language in Hartford Empire Company v. United States, 323 U.S. 386, 409–410, 65 S.Ct. 373, 385, 89 L. Ed. 322, in which a judicial decree was modified, because it placed a defendant "for the future, 'in a different class than other people'". But that ruling of the Supreme Court of the United States does not apply to the case at bar, because, through its own action, United has already put itself in a class different from any of its competitors. It has used its leases to monopolize the shoe machinery market. And if leasing continues without an alternative sales system, United will still be able to monopolize that market. To root out monopolization and to

bring United, in the future, in the same class as its competitors, it is necessary not merely to, place limitations upon United's leases, but also to require United to offer for sale any machine type which it leases. While, on its face, the decree seems to discriminate against United, in the context of the market situation created by United itself, the effect of the decree is to break down barriers erected by a monopolizer, so that, hereafter, there may be no wall between the class in which it is and the class in which its competitors are.

A second possible objection to the decree is that it confers upon United's competitors the unearned opportunity to copy the unpatented features of United's machines. These competitors get a free ride.

In reply, it might be enough to say that there does not appear to be any federal or local, statutory or common law, principle protecting United's interest in these unpatented features. See Cheney Bros. v. Doris Silk Corp., 2 Cir., 35 F.2d 279. That is, the decree takes from United nothing which the policy of our law protects. A further answer is that if the creation of a sales alternative to leasing is, as this Court believes, necessary to dissipate United's monopoly power, the Court should not withhold its decree because its effect is to allow competitors to copy United's designs. Cf. Fashion Originators' Guild of America, Inc. v. Federal Trade Commission, 312 U. S. 457, 468, 61 S.Ct. 703, 85 L.Ed. 949.

The Government goes one step further and asks the Court to require defendant to make its sales terms more attractive to customers than any lease terms it offers. One difficulty with this proposal is that, instead of redressing the balance between United and its competitors, it would give a marked advantage to such of United competitors as chose to continue leasing machines. But there are even more serious practical objections. If this Court were to direct United to make its sales terms more favorable than lease terms, and to keep that discrimination effective every time that new terms were set, every time that new machine types were introduced, and every time that money rates changed in the financial world, this Court would be

creating administrative problems which would require its continuous judicial supervision. To avoid the difficulties just stated, it seems to the Court sufficient to direct defendant, if it offers any machine type for lease, to set such terms for leasing that machine as do not make it substantially more advantageous for a shoe factory to lease rather than to buy a machine. Admittedly, there is in this direction some flexibility. But defendant is forewarned by the decree itself that if it abuses this flexibility, the Court after the entry of this decree may modify it. Thus the decree invokes the precedent not of Draco, but of Damocles and Dionysius. Compare Appalachian Coals, Inc. v. United States, 288 U.S. 344, 378, 53 S.Ct. 471, 77 L.Ed. 825.

One other phase of the decree to which this opinion should expressly advert is the method of handling those subsidiaries and branches which produce supplies in fields which United has monopolized. The clearest examples are nails and tacks, and eyelets for the shoe machinery market. These are large scale monopolizations attributable to the machinery monopoly. And United should be divested of its business of manufacturing and distributing these particular supplies, because this is the kind of dissolution which can be carried out practically, and which will also reduce monopoly power in each of the affected supply fields. Logically, the same principle might be applied to those other parts of United's enterprise which manufacture other supplies that United monopolizes. But in each of the other cases where this might at first blush seem reasonable, the supply is technically so intimately related to a machine as to be naturally manufactured by the maker of the machine, or the supply is sold in such small annual volume, or the difficulties of enforcing divestiture of part of a plant are so obvious, as to make the extension of the decree to those instances undesirable.

No similar practical difficulties exist in ordering United to divest itself of its business of distributing supplies manufactured by companies which are not part of United's organization. The annual dollar volume of some of these supplies, if looked at individually, is often not large; but the annual volume of all of them together is roughly $4½ million. The specifications for some of these supplies did originate with United, but their continued manufacture does not require United's assistance. Their distribution could be economically undertaken, if not by the several manufacturers, by a new supply distributor. And United ought not to be allowed to continue these distributorships because they flowed to United partly, at any rate, as an indirect consequence of United's prohibited monopolization of shoe machinery. To be sure, other advantages flowed to United from its monopolization; but the particular advantages inherent in the large scale distribution of supplies are, as already noted, easily severable, and would probably lead to the organization of a new supply company, or the expansion of an existing supply company, which could become in time a manufacturer of certain machine types, or a source of repair service. Thus the total effect would be to develop avenues for the dissipation of United's monopoly power in the machinery field.

Similar reasoning dictates the decree's treatment of patents. Defendant is not being punished for abusive practices respecting patents, for it engaged in none, except possibly two decades ago in connection with the wood heel business. It is being required to reduce the monopoly power it has, not as a result of patents, but as a result of business practices. And compulsory licensing, on a reasonable royalty basis, is in effect a partial dissolution, on a non-confiscatory basis. In regard to patents, as in regard to the termination of supply distributorships, the decree does no more than what defendant's own expert recognized would be appropriate if the Court found defendant had monopolized the shoe machinery market.

## Final Decree.

### February 18, 1953.

This cause having come on to be heard, and the Court having fully considered the evidence and arguments, and having filed its Findings of Fact, and Opinions on Violation and Remedy, it is hereby

Ordered, Adjudged, and Decreed that:

1. As used in this Decree:

"A Day" means six months after entry of this Decree, unless, within the period allowed by law, an appeal shall be taken to the Supreme Court of the United States, in which event "A Day" means six months after that Court sends its mandate to this Court.

"B Day" means three months after "A Day".

"C Day" means ten years after "A Day".

"Shoe machinery" means all types of shoe machinery except dry thread sewing machinery.

2. Defendant violated § 2 of the Sherman Act, 15 U.S.C.A. § 2, by monopolizing the shoe machinery trade and commerce among the several States. Defendant violated the same section of the law by monopolizing that part of the interstate trade and commerce in tacks, nails, eyelets, grommets, and hooks, which is concerned with supplying the demand for those products by shoe factories within the United States. The other charges of violation of the Sherman Act set forth in the complaint are dismissed with prejudice.

3. Defendant, its subsidiaries, and each of their directors, officers, agents, and employees, and, all persons acting for them, are hereby enjoined and restrained from further monopolizing those parts of the trade or commerce among the several States which have been referred to in the previous paragraph.

4. All leases made by defendant which include either a ten-year term, or a full capacity clause, or deferred payment charges, and all leases under which during the life of the leases defendant has rendered repair and other service without making them subject to separate, segregated charges, are declared to have been means whereby defendant monopolized the shoe machinery market.

5. After A Day, defendant shall not offer for lease any machine type, unless it also offers such type for sale. Defendant, if it offers any machine type for lease, shall set such terms for leasing that machine as do not make it substantially more advantageous for a shoe factory to lease rather than to buy a machine. Defendant shall not be required to secure advance judicial approval of the financial terms in sales or lease contracts. But if any lease or contract substantially discriminates in favor of leasing, plaintiff may apply to this Court for further specific relief.

6. Before A Day, defendant, if it desires to continue to lease any shoe machinery, shall file in this Court standard forms of lease that meet the following directions.

a. The maximum term for either an original or renewal lease shall be five years.

b. Provision shall be made that a lessee shall have the right to return the leased machine at any time after one year, on paying all rentals already accrued, the shipping charges, the cost of broken and missing parts, and in addition, no more than the equivalent of the monthly (not the unit) payments which would have been due had the lessee kept the machine for an additional three months. The lease may provide for return on terms more favorable to the lessee if the return is due exclusively to defects in the machine, or customer dissatisfaction after a trial period, or customer abandonment of operations. But no return charge shall discriminate on account of the substitution of a competitive machine.

c. The new forms of lease shall not include any return or deferred payment charges other than those specified in the previous paragraph. But they may include provisions for initial charges and deposits.

d. Defendant may, if it sees fit, use a unit charge in addition to, or as an alternative to, monthly rental charges. But such unit charges shall have no minimum.

e. After A Day, defendant shall not include within any lease, whether unit charges are used or not, a full capacity clause, or any equivalent.

f. After A Day, defendant shall not include either in the terms of, or the application of, any lease any plan similar to the right of deduction fund which it has heretofore established, or the 1935 Plan which it adopted for lessees desiring to return machinery.

g. Defendant shall not be obliged to present to the Court a statement of what will be the amount of, or method of calculating, its rentals, its charges, deposits, or like financial terms. But, after A Day, in preparing, executing, or applying its leases, defendant shall not discriminate between customers of the same general class, except that defendant may make different deposit provisions for different persons, upon an individual basis.

h. Defendant may propose various uniform lease forms particularly adapted to peak-load or experimental installations. Such special forms shall comply with the preceding paragraphs.

i. Each lease shall expressly state what services and privileges it covers. After A Day, defendant may render, without separate charges, instruction services, installation services, repair services, or other services, during a period of 30 days after the machine has been first installed. After the 30-day period, defendant shall not provide any services for the machine covered by the lease, except upon the basis of separate and reasonable charges for the services rendered.

j. Defendant shall not vary the forms of lease submitted to the Court, without the Court's approval. This provision shall not be interpreted as requiring defendant to secure advance judicial approval of the dollars and cents figures used in setting monthly rental charges, unit charges, deposits, or other specifically fiscal aspects of the lease.

7. Except for good cause, defendant shall not refuse a prospective customer's request to lease or buy a machine, of a type which defendant is currently offering for commercial lease or sale. In the event that a prospective customer is refused the privilege of buying or leasing a machine, he shall have the right to intervene in this case in this Court to have his controversy adjudicated, and in such proceedings, defendant shall have the burden of proving that there is good cause for refusing to make the sale or lease.

8. Before A Day, defendant shall present to the Court, if it desires to continue to render repair and other services, a tariff of the charges which it proposes to apply for rendering service. This service tariff shall have uniform charges for leased and sold machines. It may take into account travel time as well as time used in making repairs or rendering other services. It may recognize any economy defendant actually realizes in its business on a quantity basis, or any other economies in servicing customers of a particular type, or customers who commit themselves for particular periods of time, in any event, however, not exceeding twelve months at a time. Neither the tariff nor this Decree shall be interpreted as requiring defendant to render services in connection with machines, or parts, not of its manufacture. The tariff shall provide that parts shall be made available on the same terms to customers receiving services, customers not receiving services, and any other person; provided, however, that defendant shall not be obliged to furnish parts to a customer to help him construct an entire new machine out of assembled parts.

9. Before B Day, defendant, after conferring with plaintiff, with representatives of The National Shoe Manufacturers Association, and with any lessees who previous to A Day have intervened in these proceedings, shall present to the Court a detailed plan for terminating all outstanding leases. This plan shall make appropriate non-discriminatory financial provisions for defendant's rights and each lessee's rights in connection with the termination of existing leases. It shall also make non-discriminatory provisions under which, within a reasonable period of time, lessees under leases existing before B Day may buy or lease those machines which have been installed. Such provisions shall be at least as favorable to shoe factories as the provisions in the new lease and sale forms.

10. Before B Day, defendant shall submit a plan for disposing of such parts of its business and the business of its subsidiaries as are concerned with the manufacture or distribution of tacks, nails, eyelets, grommets, and hooks.

11. Beginning three years after A Day, defendant shall not distribute any supplies

not manufactured by itself or a corporation in which it owns at least 20% of the Common Stock, provided that this shall not apply to supplies acquired by United before then.

12. Defendant shall grant to any applicant, except a deliberate infringer, a non-exclusive license under any or all patents now held by defendant at a uniform, reasonable royalty. Such licenses shall, however, be limited to the manufacture, use, and sale of shoe machinery, shoe supplies, and like products used in shoe factories. Such licenses may contain a provision for the inspection of the records of the licensee by an independent auditor who shall report to the licensor only the amount of royalty due and payable and no other information. Such licenses shall contain a provision for imparting in writing, at a reasonable charge by the licensor to the licensee, the methods and processes used by defendant as of the date of this Decree in its commercial practices under the patents licensed. This Court reserves jurisdiction to pass upon the reasonableness of any royalty or charge herein directed to be reasonable. Nothing in this paragraph applies to patents issued upon the basis of applications filed later than A Day.

13. After A Day, defendant shall not acquire from any person not currently in its employ any patent unless it files in this Court an agreement to license that patent on the same terms provided in the previous paragraph with respect to patents it now owns.

14. After A Day, defendant shall not acquire any exclusive license under any patent.

15. After A Day, defendant shall not acquire any shoe machinery business, any business manufacturing or distributing supplies for shoe factories, or any part thereof, or any stock therein, if the transaction involves more than $10,000 or its equivalent.

16. After A Day, defendant shall not buy or acquire any second-hand shoe machinery manufactured by it or any other person except for experimental or like purposes. The total acquisitions under this paragraph in any one year shall not represent an expenditure of more than $25,000, or its equivalent. Nothing in this paragraph shall be construed to apply to such rights as defendant may have to repossess, or to acquire at public auction, machines which it has conditionally sold and which the purchaser has lost the right to retain.

17. After A Day, defendant shall not continue any plan for quantity discounts in connection with any of its supplies, unless such discount system complies with all applicable laws.

18. On C Day, both parties shall report to this Court the effect of this decree, and may then petition for its modification, in view of its effect in establishing workable competition. If either party takes advantage of this paragraph by filing a petition, each such petition shall be accompanied by affidavits setting forth the then structure of the shoe machinery market and defendant's power within that market.

19. Defendant shall pay the costs of this case.

20. Three months before A Day, defendant shall send to each of its then lessees a written copy of this decree.

21. Nothing in this Decree shall impose any obligation on defendant until three months before A Day.

22. Nothing in this Decree shall impose any obligation on defendant or its subsidiaries to do or omit any action outside the United States.

23. Jurisdiction of this cause is retained for the purpose of enabling either of the parties to apply to this Court at any time for such further orders and directions as may be appropriate for the correction, construction, or carrying out of this Decree, and to set aside the Decree and take further proceedings if future developments justify that course in the appropriate enforcement of the Anti-Trust Act.